**RECORD NO. 13-20528**

*In The*

# United States Court of Appeals

### For The Fifth Circuit

## APRIL SCARLOTT,

*Plaintiff – Appellant*,

**v.**

## NISSAN NORTH AMERICA, INCORPORATED; HURRICANE GLASS; HURRICANE AUTO CARE & ACCESSORIES, INCORPORATED,

*Defendants – Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON

_____

## BRIEF OF APPELLANTS

_____

Aaron D. Radbil
THE LAW OFFICE OF AARON D. RADBIL, PLLC
801 North Brickell Avenue, Suite 900
Miami, Florida  33131
(561) 826-5477
aaron@adrlawoffice.com

*Counsel for Appellants*
 *April Scarlott and Weisberg & Meyers, LLC*

## Certificate of Interested Persons

(1)    No. 13-20528 April Scarlott v. Nissan North America, Inc., *et al*.

(2)    The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

April Scarlott
*Plaintiff-Appellant*

Weisberg & Meyers, LLC
*Appellant*

Noah Radbil
*Appellant*

The Law Office of Aaron D. Radbil, PLLC
Aaron D. Radbil
*Attorney for April Scarlott and Weisberg & Meyers, LLC*

Nissan North America, Inc.
Neil Barnes
*Defendant-Appellee*

Hartline Dacus Barger Dreyer, L.L.P.
Jeffrey Patterson
Giovanna Tarantino Bingham
*Attorneys for Nissan North America, Inc.*

Hurricane Auto Care & Accessories, Inc.
Srinivasa "Sam" Gogineni
*Defendant-Appellee*

Leslie Wm. Adams & Associates
Leslie William Adams
*Attorney for Hurricane Auto Care & Accessories, Inc.*

/s/ Aaron D. Radbil
Aaron D. Radbil

## Statement Regarding Oral Argument

The district court lacked subject matter jurisdiction over this case because an action under the Magnuson Moss Warranty Act ("MMWA") may not proceed in a federal court if the amount in controversy is less than $50,000.00. Here, the amount in controversy is, at most, $31,881.00. So to the extent that this Court chooses to address only the issue of subject matter jurisdiction, oral argument is likely not warranted. Should this Court, however, choose to address the remaining issues, oral argument may help it to understand relevant circumstances and pertinent contextual details, following a reading of the large number of briefs, as well as the voluminous transcripts, that make up the record on appeal.

# Table of Contents

**Page**

Certificate of Interested Persons ..................................................................i

Statement Regarding Oral Argument ..................................................... iii

Table of Authorities ................................................................................ xii

Statement of Subject Matter Jurisdiction and Appellate Jurisdiction........................1

Statement of the Issues............................................................................1

Statement of the Case..............................................................................5

Statement of the Facts .............................................................................5

    A.    NNA issued Ms. Scarlott its standard written warranty.......................5

    B.    Scarlott purchased a Nissan Security+Plus® Vehicle Protection Plan .......................................................................................5

    C.    Scarlott returned the Murano to CLN because it lacked a Homelink mirror. CLN then entered into an agreement with Hurricane to install the missing Homelink mirror ................................6

    D.    Scarlott experienced repeated problems with the Murano's electrical system. But despite its many repair attempts, CLN was unable to correct these problems....................................................7

    E.    NNA never refused to reimburse CLN for the repairs it performed on the Murano. Nor did NNA ever ask CLN to refund the reimbursements .................................................................9

    F.    Scarlott retained W&M to pursue claims on her behalf.....................10

    G.    W&M filed Scarlott's petitions in a Texas state court.......................11

H.   In response to Scarlott's petition, NNA's counsel suggested that the "design or manufacture" of the Homelink mirror caused the Murano's electrical problems, and recommended that Scarlott sue Hurricane ........................................................................................ 11

I.   NNA's initial answers and responses to Scarlott's written discovery requests supported her claims ............................................... 11

J.   During his deposition, Frank Gore—CLN's service director— acknowledged not only that the Murano's electrical problems were intermittent, but that NNA advised CLN to repair the Murano's BCM "because they're waking up and zapping the batteries" ............................................................................................. 12

K.   NNA filed a motion to designate "Hurricane Glass" as a responsible third party ........................................................................ 13

L.   W&M amended Scarlott's original petition to add NMAC and Hurricane as party defendants ............................................................ 13

M.   NMAC removed this matter to the district court. But despite W&M's early suggestion that it lacked subject matter jurisdiction over Scarlott's claims, the district court refused to remand this matter to the state court .................................................. 14

N.   During his deposition, Neil Barnes—NNA's designated corporate representative—acknowledged that if the BCM in the Murano didn't power down it could have caused the drain to the Murano's battery ............................................................................... 14

O.   Through his expert report, Ryan Schooley—NNA's expert— confirmed that he was "aware of instances where the BCM would not 'go to sleep' thereby resulting in a battery drain" ............. 15

P.   During his deposition, Srinivasa "Sam" Gogineni—Hurricane's owner—made clear that Hurricane never installed a diode in the Homelink mirror .................................................................................. 15

Q.      Through its amended motion for summary judgment, and for the first time, NNA contended that the installation of the Homelink mirror was the cause of the Murano's electrical problems ............................................................................................16

R.      During his deposition, Schooley admitted that the Homelink mirror did *not* remain on at all times. He also confirmed—for the second time—that he was aware that BCMs in Muranos were known to "not fall asleep" ...........................................................16

S.      W&M discovered that the Homelink mirror that Hurricane installed in the Murano could not have drawn more than 450 milliamps from its battery at any time ................................................17

T.      Stephen Weaver—Scarlott's expert—concluded that the Murano's electrical problems were caused by defects in NNA components...........................................................................................17

U.      Scarlott's research revealed many, many complaints about the very same problems she experienced with the Murano ......................17

V.      The district court conceded that CLN never fixed the Murano's electrical problems ............................................................................18

Summary of the Argument.....................................................................................18

Argument.................................................................................................................20

I.      The district court lacked subject matter jurisdiction over this matter. It therefore erred in denying Scarlott's motion to remand .............................................................................................20

        A.      This Court must review the district court's refusal to remand this matter to the state court *de novo* ...........................20

        B.      An action under the MMWA may not proceed in a federal court if the amount in controversy is less than $50,000. Because the amount in controversy here is at most $31,881.00, the district court lacked subject matter jurisdiction over Scarlott's claims ............................................20

1.  The amount in controversy for purposes of a plaintiff's claim under the MMWA is, at most, the value of the subject vehicle. Here, because the sales price of the Murano was $31,881.00, the amount in controversy could not have satisfied the MMWA's jurisdictional requirement ...........................21

2.  A plaintiff's discovery control plan does not affect the amount in controversy for federal jurisdictional purposes. The district court's suggestion otherwise is incorrect ....................................................................25

3.  But even if Scarlott's discovery control plan was relevant to the amount in controversy, W&M included in her amended petition an unequivocal statement showing that she sought no more than $39,500.00, excluding attorneys' fees and costs ............27

4.  The district court's implication that W&M strategically waited thirty months to file Scarlott's motion to remand is not true..........................................28

5.  The procedural history of this matter demonstrates that Scarlott's motion to remand did not constitute an attempt to "start her case over at the eleventh hour" .............................................................................29

II.  W&M presented evidence in support of Scarlott's claims for breach of express and implied warranties. The district court therefore erred in granting NNA's motion for summary judgment. At the very least, a genuine issue of material fact remained for a jury to consider ...........................................30

A.  This Court must review *de novo* the district court's decision to grant NNA's motion for summary judgment ........30

vii

B.   W&M presented evidence to support that NNA breached its written warranty by failing to repair the Murano's electrical problems after Scarlott provided it a reasonable number of attempts to do so..................................................30

  1.   W&M presented evidence that NNA covered CLN's repairs to correct the Murano's defective electrical system under its warranty ..............................31

  2.   W&M presented evidence that Scarlott complied with the terms of NNA's warranty ..................................33

  3.   W&M presented evidence that Scarlott provided NNA a reasonable opportunity to repair the Murano's electrical problems .........................................33

  4.   W&M presented evidence that NNA was unable to repair the Murano's electrical problems after Scarlott provided it a reasonable number of attempts to do so ............................................................33

  5.   W&M presented evidence that the Murano's electrical problems were caused by defective NNA components. In granting NNA's motion for summary judgment, the district court therefore ignored what was at least a genuine issue of material fact ..................................................................36

      i.   By covering CLN's repairs to correct the Murano's electrical problems under its warranty, NNA admitted the problems were caused by defects in its materials or workmanship .......................................................37

      ii.  Testimony from each of NNA's three witnesses corroborated that the Murano's defective BCM—an NNA component— could very well have caused the Murano's electrical problems ...............................................39

iii.   Weaver concluded that the Murano's electrical problems were caused by defects in NNA components ..............................................41

6.   Notwithstanding, the MMWA did not, as the district court insinuated, require Scarlott to identify the exact cause of the Murano's electrical problems. Rather, W&M was simply required to demonstrate a malfunction..............................................41

C.   W&M presented evidence that NNA breached its implied warranty of merchantability as the Murano was not fit for the ordinary purpose for which it was to be used .....................42

III.   W&M filed Scarlott's claim against Hurricane within two years of the date that she knew, or should have known, of the facts giving rise to it. The district court therefore erred in dismissing Scarlott's claim against Hurricane because it was "brought too late".................................................................................................44

A.   This Court must review *de novo* the district court's decision to grant Hurricane's motion for summary judgment...................................................................................44

B.   The discovery rule tolled the two year statute of limitations that applied to Scarlott's claim against Hurricane until the date on which CLN informed her that the cause of the Murano's electrical problems was the Homelink mirror. W&M filed Scarlott's claim against Hurricane well within two years of this date ............................44

IV.   Neither W&M nor Noah Radbil unreasonably extended proceedings regarding NNA. Consequently, the district court's decision to award NNA sanctions, under 28 U.S.C. § 1927 and its inherent authority, was not justified ...............................................46

A.   This Court must review the district court's decision to impose sanctions against W&M and Noah Radbil for abuse of discretion ...................................................................46

B.    The district court's decision to sanction W&M and Noah Radbil, under 28 U.S.C. § 1927 and its inherent authority, was not justified, as they neither acted with bad faith nor improper motive ........................................................47

1.    W&M and Noah Radbil presented evidence that NNA's counsel's first defense theory—that "the design or manufacture of the mirror itself" was the cause of the Murano's electrical problems—was without merit. After W&M did so, NNA's counsel abandoned its theory, but only after devoting a year of litigation to it ......................................................49

2.    W&M and Noah Radbil presented evidence that NNA's counsel's second defense theory—that the *installation* of the Homelink mirror was the cause of the Murano's electrical problems—was also without merit.................................................51

V.    Neither W&M nor Noah Radbil unreasonably advanced Scarlott's claim against Hurricane "without reasonable or probable cause or excuse." The district court's decision to award Hurricane sanctions, under 28 U.S.C. § 1927 and its inherent authority, was therefore not justified ....................................53

A.    To the extent that the district court's decision to award Hurricane sanctions was based on its finding that "Scarlott's claim was brought too late," this Court must review it *de novo* ......................................................53

B.    The district court's decision to award Hurricane sanctions was not justified as it is not reasonable that Scarlott "should have known" the cause the Murano's electrical problems *before* even CLN—NNA's authorized dealership—made such a determination ...................................54

VI.   Neither NNA nor Hurricane satisfied their burden in connection with their requests for hundreds of thousands of dollars in attorneys' fees. The district court therefore erred in awarding attorneys' fees against W&M and Noah Radbil .................................55

A.    This Court must review the district court's decision to award attorneys' fees and costs against W&M and Noah Radbil for abuse of discretion ...................................................55

B.    Neither NNA nor Hurricane submitted evidence to support their requests for hundreds of thousands of dollars in attorneys' fees. The district court could therefore not have conducted the inquiry that it was required to undertake ...............................................................56

VII.    Weaver's testimony satisfied Rule 702's requirements. The district court therefore erred in striking it ...........................................58

A.    This Court must review the district court's decision to strike Weaver's testimony for abuse of discretion ..................58

B.    Weaver based his testimony on "technical" or "other specialized knowledge." Therefore, as the district court did not find Weaver's credentials deficient, his testimony was admissible ........................................................................58

Conclusion .........................................................................................................61

Certificate of Filing and Service

Certificate of Compliance

# Table of Authorities

Page(s)

## Cases

*ABB, Inc. v. Pena*,
   No. L–10–83, 2011 WL 906651 (S.D. Tex. Mar. 15, 2011).........................57

*Abedrabbo v. Topps Meat Co., LLC*,
   756 F. Supp. 2d 18 (D.D.C. 2010)...................................................22

*Ansari v. Bella Auto. Grp., Inc.*,
   145 F.3d 1270 (11th Cir. 1998).....................................................22

*Baulch v. Johns*,
   70 F.3d 813 (5th Cir. 1995) .........................................................49

*Boelens v. Redman Homes, Inc.*,
   748 F.2d 1058 (5th Cir. 1984) ...............................................22, 24

*Burke v. Ins. Auto Auctions Corp.*,
   169 S.W.3d 771 (Tex. App. 2005) ................................................44

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...................................................................30

*Chan v. Coggins*,
   294 F. App'x 934 (5th Cir. 2008)..................................................58

*Compass Bank v. Villarreal*,
   No. L–10–8, 2011 WL 1740270 (S.D. Tex. May 5, 2011) ............................57

*Edwards v. Gen. Motors Corp.*,
   153 F.3d 242 (5th Cir. 1998) .......................................................47

*F.D.I.C. v. Dawson*,
   4 F.3d 1303 (5th Cir. 1993) .........................................................44

*Franks v. Nat'l Dairy Products Corp.*,
   414 F.2d 682 (5th Cir. 1969) ........................................................................37

*Friedrich v. Local No. 780, IUE-AFL-CIO-CLC*,
   515 F.2d 225 (5th Cir. 1975) ........................................................................28

*Gagnon v. United Technisource, Inc.*,
   607 F.3d 1036 (5th Cir. 2010) .......................................................................56

*Gardynski-Leschuck v. Ford Motor Co.*,
   142 F.3d 955 (7th Cir. 1998) ...................................................................22, 23

*Gen. Motors Corp. v. Brewer*,
   966 S.W.2d 56 (Tex. 1998) ...........................................................................42

*Golden v. Gorno Bros., Inc.*,
   410 F.3d 879 (6th Cir. 2005) .........................................................................24

*Hagerty v. Succession of Clement*,
   749 F.2d 217 (5th Cir. 1984), *cert. denied*,
   474 U.S. 968 (1985)......................................................................................47

*HECI Exploration Co. v. Neel*,
   982 S.W.2d 881 (Tex. 1998) ..........................................................................44

*Hendrix v. Evenflo Co., Inc.*,
   255 F.R.D. 568 (N.D. Fla. 2009) ....................................................................60

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983).......................................................................................56

*Holcomb v. Cessna Aircraft Co.*,
   439 F.2d 1150 (5th Cir. 1971) ..................................................................37, 38

*Holy Cross Church of God in Christ v. Wolf*,
   44 S.W.3d 562 (Tex. 2001) .......................................................................44, 53

*Hood ex rel. Mississippi v. JP Morgan Chase & Co.*,
   737 F.3d 78 (5th Cir. 2013) ...........................................................................20

*Horton v. Bank One, N.A.*,
No. A-03-CA-150-SS, 2003 WL 25737885 (W.D. Tex. May 6, 2003)........26

*Hughes Training Inc. v. Cook*,
254 F.3d 588 (5th Cir. 2001) .......................................................................53

*Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*,
995 S.W. 2d 661 (Tex. 1999) .......................................................................43

*In re Sarabia*,
No. 06-31109-RCM, 2007 WL 1394388
(Bankr. W.D. Tex. May 9, 2007)...................................................................27

*In re Silica Products Liab. Litig.*,
398 F. Supp. 2d 563 (S.D. Tex. 2005)..........................................................47

*La. Power & Light Co. v. Kellstrom*,
50 F.3d 319 (5th Cir. 1995) .......................................................55, 56, 57, 58

*Larry J. Soldinger Assocs., Ltd. v. Aston Martin Lagonda of N. Am., Inc.*,
No. 97 C 7792, 1999 WL 756174 (N.D. Ill. Sept. 13, 1999) ......................41

*Lewis v. Mercedes-Benz USA, LLC*,
No. CIV.A. V-11-16, 2011 WL 2442659 (S.D. Tex. June 14, 2011) ..........26

*Lowery v. Metro. Transit Auth. of Harris Cnty.*,
54 F. App'x 793 (5th Cir. 2002)...................................................................30

*Marchionna v. Ford Motor Co.*,
No. 94 C 275, 1995 WL 476591 (N.D. Ill. Aug. 10, 1995) .........................36

*Mason v. Porsche Cars of N. Am., Inc.*,
688 So. 2d 361 (Fla. Dist. Ct. App. 1997)...............................................41, 42

*Meadowbriar Home for Children, Inc. v. Gunn*,
81 F.3d 521 (5th Cir. 1996) .........................................................................47

*Messana v. Mercedes-Benz of N. Am., Inc.*,
5 F. App'x 522 (7th Cir. 2001)....................................................................24

*Milicevic v. Fletcher Jones Imports, Ltd.*,
    402 F.3d 912 (9th Cir. 2005) ........................................................38

*Misel v. Mazda Motor of Am., Inc.*,
    420 F. App'x 272 (4th Cir. 2011)................................................22

*Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*,
    534 U.S. 327 (2002)....................................................................27

*Northwinds Abatement, Inc. v. Employers Ins. of Wausau*,
    258 F.3d 345 (5th Cir. 2001) ................................................56, 57

*Orange Motors of Coral Gables v. Dade Cnty. Dairies, Inc.*,
    258 So. 2d 319 (Fla. Dist. Ct. App. 1972)..................................34

*Pearson v. DaimlerChrysler Corp.*,
    349 Ill. App. 3d 688 (Dist. 1, 2004) ......................................31, 34

*Pipitone v. Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) ................................................58, 60

*Porter v. Am. Optical Corp.*,
    641 F.2d 1128 (5th Cir. 1981) ....................................................38

*Religious Tech. Ctr. v. Liebreich*,
    98 F. App'x 979 (5th Cir. 2004)...........................................46, 53

*Roadway Express, Inc. v. Piper*,
    447 U.S. 752 (1980)....................................................................47

*Roxbury v. Gulf Stream Coach, Inc.*,
    No. CIV A 07-6046(MLC), 2008 WL 4307113
    (D.N.J. Sept. 15, 2008) ..............................................................23

*Rushing v. Kan. City S. Ry. Co.*,
    185 F.3d 496 (5th Cir. 1999) ......................................................59

*S.V. v. R.V.*,
    933 S.W.2d 1 (Tex. 1996) ...........................................................44

*Samuel-Bassett v. KIA Motors Am., Inc.*,
        357 F.3d 392 (3d Cir. 2004) ..........................................................23

*Schimmer v. Jaguar Cars, Inc.*,
        384 F.3d 402 (7th Cir. 2004) ........................................................24

*TIG Ins. Co. v. Aon Re, Inc.*,
        521 F.3d 351 (5th Cir. 2008) ........................................................44

*Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc.*,
        38 F.3d 1414 (5th Cir. 1994) ..................................................47, 49

*U.S. v. Gomez*,
        No. EP–10–CR–1326–KC, 2012 WL 2899715
        (W.D. Tex. July 9, 2012) ...............................................................49

*Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs and
Trainmen Gen. Comm. of Adjustment, Cent. Region*,
        558 U.S. 67 (2009).........................................................................21

*Universal Motors, Inc. v. Waldock*,
        719 P.2d 254 (Alaska 1986) ..........................................................37

*Ventura v. Ford Motor Corp.*,
        433 A.2d 801 (N.J. 1981) ..............................................................33

*Viterbo v. Dow Chemical Co.*,
        826 F.2d 420 (5th Cir. 1987) ........................................................60

*Walton v. Rose Mobile Homes LLC*,
        298 F.3d 470 (5th Cir. 2002) ........................................................30

*Wood v. B.C. Daniels, Inc.*,
        No. MISC.A. 08-0003-WS-M B.C., 2008 WL 2163921
        (S.D. Ala. May 21, 2008) ...............................................................55

**Statutes**

15 U.S.C. § 2301(7) ............................................................................42

15 U.S.C. § 2310(d)(1)..............................................................20, 21, 42

15 U.S.C. § 2310(d)(3)........................................................................24

15 U.S.C. § 2310(d)(3)(B) ..............................................................21, 22

15 U.S.C. § 2310(e) ...........................................................................33

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 ...............................................................................20

28 U.S.C. § 1927...................................................................3, 46, 47, 53

Tex. Bus. & Com. Code Ann. § 2.314(b)(3) .........................................42

**Rules**

Tex. R. Civ. P. 190.1....................................................................25, 26

Tex. R. Civ. Proc., Pt. II, § 9, R. 190, Refs & Annos, cmt. 1 (1999) .....................26

**Regulation**

16 C.F.R. § 701.1(d) ..........................................................................42

**Other Authorities**

9 ROBERT HAIG, BUS. & COM. LITIG. IN FED. CTS. § 101:136 (3d ed.) ...................21

A.R.S. § 44-1263(B)(2) .......................................................................37

BARKLEY CLARK & CHRISTOPHER SMITH, THE LAW OF PRODUCT
WARRANTIES (2008).........................................................................43

H.R. Rᴇᴘ. Nᴏ. 93-1107 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7705, 7707, 7709–10.......................................................................................................30, 31, 34

H.R. Rᴇᴘ. Nᴏ. 93-1606 (1974) ...................................................................................34

John Goren, *Buyer's Right to Revoke Acceptance Against The Automobile Manufacturer For Breach of Its Continuing Warranty of Repair or Replacement*, 7 Ga. L. Rev. 711 (1973)...................................................................34

Illinois Pattern Jury Instruction, 185.03...................................................................31

**Statement of Subject Matter Jurisdiction and Appellate Jurisdiction**

The United States District Court for the Southern District of Texas ("district court") lacked jurisdiction over April Scarlott's action. The district court, nonetheless, refused to remand her claims to the District Court for Harris County, Texas ("state court")—the court in which Weisberg & Meyers, LLC ("W&M") filed them. R.2964–R.2965. Because, in part, the district court did not have authority to hear this matter, Scarlott, W&M, and Noah Radbil filed their notice of appeal, R.2968, which they subsequently amended. This Court has jurisdiction over their appeal under 28 U.S.C. § 1291.

**Statement of the Issues**

1.  An action under the MMWA may not proceed in a federal court if the amount in controversy is less than $50,000.00. Under the MMWA the amount in controversy is, at most, the value of the subject vehicle. Here, Scarlott paid $31,881.00 for her 2006 Nissan Murano ("Murano"). So as the amount in controversy could not have exceeded $31,881.00, did the district court err in refusing to grant Scarlott's motion to remand?

2.  The district court granted Nissan North America, Inc.'s ("NNA") motion for summary judgment not because it found a necessary element of Scarlott's claims for breach of express and implied warranties lacking, but because it held that the cause of the Murano's electrical problems was something other

1

than a defective NNA component—an affirmative defense for which NNA bore the burden of proof. W&M presented evidence, however—in the form of written documentation, as well as the testimony of four separate witnesses—that the cause of the Murano's electrical problems was likely defective NNA components. What's more, after it granted NNA's motion for summary judgment, the district court proclaimed: "I don't know what's wrong with the car. I've never known what's wrong with the car." So did the district court err in summarily dismissing Scarlott's claims based on its finding that a non-NNA component caused the Murano's electrical problems, even though Scarlott presented evidence upon which a reasonable jury could have decided otherwise?

3.  A two year statute of limitations applies to a plaintiff's claim for negligence. Although this period typically begins to run when a wrongful act causes some legal injury, the discovery rule defers its accrual until the plaintiff should have known of the facts giving rise to her claim. Here, until December 2009, NNA's authorized dealership—Clear Lake Nissan ("CLN")—informed Scarlott that the cause of the Murano's electrical problems was *not* the Homelink mirror. Approximately one year after CLN changed its mind, and informed Scarlott that the cause of the Murano's electrical problems was the Homelink mirror, W&M filed Scarlott's claim

against Hurricane Auto Care & Accessories, Inc. ("Hurricane"). So did the district court err in dismissing Scarlott's claim against Hurricane because it "was brought too late," even though W&M filed her claim approximately one year after she reasonably should have discovered it?

4.    28 U.S.C. § 1927 is a means for imposing sanctions on lawyers who unreasonably extend court proceedings. Here, W&M and Noah Radbil not only presented evidence to support each element of Scarlott's claims against NNA, but they also presented evidence invalidating both of NNA's defense theories—one of which NNA voluntarily abandoned after it subsumed an entire year of this matter. So did the district court err in awarding NNA sanctions simply because W&M and Noah Radbil did not dismiss Scarlott's claims at NNA's first say so?

5.    A district court may properly award sanctions under 28 U.S.C. § 1927 where the offending party acted "without reasonable or probable cause or excuse." Here, not even NNA believed that W&M and Noah Radbil acted in such a manner with respect to Scarlott's claim against Hurricane. In fact, NNA wrote to W&M and suggested that Scarlott's claim against Hurricane was not only appropriate, but timely. So did the district court err in awarding sanctions to Hurricane where W&M and Noah Radbil acted reasonably in connection with Scarlott's claim against it—as evidenced, if by nothing

more, than the simple fact that two of the three current parties to this matter believed that Scarlott had cause to bring her claim against Hurricane?

6.     A party seeking an award of attorneys' fees bears the burden to submit evidence supporting the hours worked and rates claimed. In fact, the district court previously explained "that any fee request must be supported by detailed documentation, including itemized billing records." Here, neither NNA nor Hurricane submitted contemporaneous billing records. Nor did they submit other evidence in lieu of these records. So did the district court err in awarding NNA and Hurricane hundreds of thousands of dollars in attorneys' fees absent any record evidence justifying the amount of the award?

7.     The number of times that a witness has testified in unrelated matters relates to credibility, not to admissibility. Here, the district court struck Scarlott's expert's testimony, noting the fact that "he writes approximately 100 opinions for Scarlott's lawyer per year" made his testimony in this matter "unqualified by reason of association with the firm." So did the district court err in striking Scarlott's expert's testimony based on the number of occasions he provided opinions in unrelated matters?

## Statement of the Case

W&M filed Scarlott's original petition in the state court. R.35–R.56. Over a year later, Nissan Motor Acceptance Corporation ("NMAC") removed Scarlott's action to the district court. R.22–R.25. The district court thereafter refused to grant Scarlott's motion to remand. R.2964–R.2965. It later entered final judgment against Scarlott, R.2966, and awarded attorneys' fees against her, W&M, and Noah Radbil. R.4937.

## Statement of the Facts

### A.    NNA issued Ms. Scarlott its standard written warranty.

Scarlott purchased the Murano from CLN for $31,881.00. R.1811–R.1815, 1818. As consideration for her purchase, NNA issued Ms. Scarlott its standard written warranty. R.1545–R.1599. NNA's warranty covered *only* "repairs needed to correct defects in materials or workmanship of all parts and components of [the Murano] supplied by Nissan." R.1557.

### B.    Scarlott purchased a Nissan Security+Plus® Vehicle Protection Plan.

In addition to NNA's warranty, Scarlott purchased a Nissan Security+Plus® Vehicle Protection Plan ("Protection Plan"), which covered "repair[s] to replace all covered parts of [the Murano] . . . . due solely to defects in Nissan materials or faulty workmanship for which Nissan is responsible." R.1822.

**C.    Scarlott returned the Murano to CLN because it lacked a Homelink mirror. CLN then entered into an agreement with Hurricane to install the missing Homelink mirror.**

The day after Scarlott took possession of the Murano, she returned it to CLN because it was not equipped with a Homelink mirror—an option for which CLN charged her. *See* R.3706, 102:23–25, 103:1–3; *see also* R.919. Scarlott described the Homelink mirror as a device that allows her to turn her house lights and house alarm on and off without getting out of her vehicle. R.4100, 44:24–R.4101, 45:2. That the Murano was to be equipped with a Homelink mirror was one of the major reasons that Scarlott decided to purchase it, as she had previously been the victim of a stalker. R.4100, 44:9–14.

 Realizing its mistake, CLN offered to install a Homelink mirror in the Murano. R.4096, 28:3–25; R.4097, 29:1–2. Concerned, however, about the consequence of CLN's offer, Scarlott inquired as to whether the installation would invalidate NNA's warranty. R.4097, 29:3–5. CLN assured her that it would not, explaining that the installation center was "factory-authorized." R.4097, 29:5–7.

CLN then "entered into an agreement with [Hurricane] to install a Homelink system on the [Murano]." R.3848, 114:14–16. It subsequently gave Scarlott a voucher for the installation, and directed her to Hurricane's physical address. R.4097, 29:10–17. Hurricane then installed a Homelink mirror in the Murano. R.1051; R.1473.

**D.     Scarlott experienced repeated problems with the Murano's electrical system. But despite its many repair attempts, CLN was unable to correct these problems.**

Approximately nine months after Scarlott took possession of the Murano she began to experience problems with it. She tendered the Murano to CLN for repairs to its electrical system on seven separate occasions. R.1469–R.1494; R.1909–R.1911; R.1916–R.1917; R.3675, 27:21–23.

Scarlott initially did so because "on more than one occasion the vehicle would not crank or start." R.1479. As a result, CLN replaced the Murano's battery. R.1479. It did so under NNA's warranty. R.1903. NNA later reimbursed CLN for performing this repair. R.1479.

Subsequently, and having driven the Murano only fifty miles since CLN's previous repair, Scarlott tendered it to CLN because "the check engine light [wa]s on," because "none of the dome lights work[ed]," and the "air bag light was flashing." R.1481. CLN consequently installed a "dome fuse" and "reset [the] cont unit." R.1481.

Next, Scarlott tendered the Murano to CLN because it again would not start. R.1485. In an effort to correct this problem, CLN—for the second time—replaced the Murano's battery, noting that it had an "internal failure." R.1485.

Two months later, Scarlott again tendered the Murano to CLN because it "w[ould] not crank," and "because the battery [went] dead @ times after sitting."

R.1486. CLN then replaced the Murano's battery—for the third time—but only after documenting that it found a "parasitic drain 23 milliamps ck on 3 different days." R.1486. CLN made this repair under NNA's warranty. R.1904. NNA later reimbursed CLN for performing the repair. R.1904.

Thereafter, and having driven the Murano less than 3,000 miles since the date of CLN's last repair, Scarlott had the Murano towed to CLN because "the battery [wa]s dead." R.1489. On this occasion, CLN found that the "BCM [was] not falling asleep." R.1489. Accordingly, and in an attempt to correct what it referred to as an "electrical problem," CLN reconfigured and installed the BCM. R.1489. It performed this repair under NNA's warranty. R.1904. NNA later reimbursed CLN for performing the repair. R.1904.

Several days later, Scarlott again tendered the Murano to CLN because "the vehicle die[d] at a stop." R.1492. CLN inspected the Murano, but was unable to diagnose the problem. R.1492.

Not more than a week after that, Scarlott—for the second time—had her vehicle towed to CLN because "the vehicle w[ould] not crank." R.1492. CLN tested the Murano's battery, found that it was dead, and replaced it—for the fourth time. R.1492. CLN performed this repair under NNA's warranty. R.1905. NNA later reimbursed CLN for performing the repair. R.1905.

Approximately one month later, Scarlott—for the third time—had her vehicle towed to CLN for repair because "the vehicle w[ould] not crank." R.1494. CLN performed tests on the Murano, and noted that it "found [the] aftermarket rear view mirror [to be] causing draw." R.1494. It then "sent out [the Murano] to be repaired." R.1494. Upon returning the Murano to Scarlott, CLN noted: "Vehicle returned with no electrical draw on system." R.1494.

But despite CLN's statement that it returned the Murano to Scarlott with no electrical issues remaining, she continued to experience the same problems for which she repeatedly tendered the Murano for repair. In all, the Murano failed to start on at least five occasions after CLN returned it to Scarlott "with no draw on the electrical system." R.2757–R.2762. On three of these occasions, Scarlott was stranded away from her home. R.2757–R.2759; *see also* R.4151, 247:8–15, 248:1–249:17.

In all Scarlott was without use of the Murano for fifty-three days. *See* R.1471–R.1494. And at one point, the Murano remained at CLN for twenty-eight consecutive days for repair. R.1494.

## E. NNA never refused to reimburse CLN for the repairs it performed on the Murano. Nor did NNA ever ask CLN to refund the reimbursements.

NNA may deny one of its dealership's reimbursement requests if it determines that the repair for which reimbursement is requested is not necessitated by "defects in [NNA] materials or workmanship." S*ee* R.1557; R.3771:17–21.

NNA did not, however, deny a single one of CLN's requests for reimbursement in connection with the repairs it performed on the Murano. R.3674, 24:4–17.

Similarly, NNA is entitled to demand that one of its dealerships return any funds paid as a result of a reimbursement request, if NNA later determines that the reimbursement request was for a repair that should not have been covered by NNA's warranty. R.3858:23–R.3859:2; R.3859:18–22. NNA never made such a demand to CLN. R.3860:18–23.

**F.     Scarlott retained W&M to pursue claims on her behalf.**

Fed up with the repeated problems she was experiencing with the Murano, Scarlott submitted a written inquiry, and a great deal of related documentation, to W&M. R.3427:3–R.3428:5. W&M then preliminarily determined—based on its attorneys' significant experience with cases like Scarlott's—that she had potential claims against NNA under the MMWA and related state laws. R.3428, 6–8. But W&M did not agree to represent Scarlott until its expert consultant—an A.S.E. Master Technician, with over thirty-three years of experience in the automotive industry, and whose testimony Texas courts had previously found reliable and admissible—also concluded that Scarlott had valid claims against NNA. R.3429:10–R.3430:14.

G.    **W&M filed Scarlott's petitions in a Texas state court.**

Unable to persuade NNA to provide Scarlott the relief that she requested,

W&M filed Scarlott's original petition in the state court, alleging that NNA

violated the MMWA and the Texas Deceptive Trade Practices Act ("DTPA").

R.35–R.44. Her amended petition incorporated by reference a demand for

"damages totaling $39,500." R.98, 44; R.2833–R.2834.

H.    **In response to Scarlott's petition, NNA's counsel suggested that the "design or manufacture" of the Homelink mirror caused the Murano's electrical problems, and recommended that Scarlott sue Hurricane.**

NNA's counsel responded to Scarlott's petition by letter, explaining that

"the installation of the mirror is not the cause of the battery draining; it is the

design or manufacture of the mirror itself." R.869. It also contended that Hurricane

ultimately corrected the problem when it "installed a diode . . . prohibiting the

aftermarket mirror to pull electricity from the battery." R.869. NNA's counsel

additionally took care to note that CLN "believed the battery issue was

intermittent." R.869. It concluded its letter by suggesting that "Scarlott may have a

cause of action against Hurricane Glass." R.870.

I.    **NNA's initial answers and responses to Scarlott's written discovery requests supported her claims.**

W&M served NNA with written discovery requests. The documentation that

W&M correspondingly received confirmed that CLN performed repeated repairs,

under NNA's warranty, in an effort correct the Murano's electrical problems.

R.1471–R.1494. The documentation also contradicted NNA's suggestion that the Homelink mirror was the cause of the Murano's electrical problems. R.1471–R.1494.

**J.**     **During his deposition, Frank Gore—CLN's service director— acknowledged not only that the Murano's electrical problems were intermittent, but that NNA advised CLN to repair the Murano's BCM "because they're waking up and zapping the batteries."**

Before NNA provided W&M an opportunity to depose an NNA representative, it deposed Gore. During his deposition, Gore explained that the Murano's electrical problems were intermittent. R.3674, 25:22–R.3675, 26:2; R.3676, 29:4–8, 30:8–12, 30:24–25; R.3722, 142:6–7; R.3727, 152:20–22; R.3728, 156:3–7. He then stated that whenever the cause of the intermittent electrical problems "would wake up, it would zap the battery." R.3720, 136:21–25; R.2723–R.2725.

While outlining CLN's unsuccessful attempts to correct the Murano's electrical problems, Gore then testified that an NNA engineer advised him: "When you've got a known issue—if you got GTR or a Murano with a battery going dead, just fan them, put a BCM[1] in there, because they're waking up and zapping the batteries." R.3724, 145:11–14; R.3725, 148:9–10. Gore later confirmed that CLN attempted to repair the Murano's BCM, under NNA's warranty, because NNA

---

[1]     A "BCM" is a body controle module. NNA's designated corporate representative testified that the Murano's BCM is a "factory-installed piece of hardware." R.3896:10-20.

"came out with a deal on Muranos and GTRs if you got a phantom battery drain, is to replace the BCM." R.3723, 144:25–145:2.

**K.    NNA filed a motion to designate "Hurricane Glass" as a responsible third party.**

Almost immediately after Gore's deposition NNA's counsel filed a motion to designate "Hurricane Glass"—the facility that NNA believed to have installed the Homelink mirror—as a responsible third party. R.3577–R.3580. NNA concluded that "Hurricane Glass breached the above duties, and such negligent acts and/or omissions were a proximate and/or producing cause of Plaintiff's damages, if any." R.3578, 9.

**L.    W&M amended Scarlott's original petition to add NMAC and Hurricane as party defendants.**

Due in part to NNA's motion to designate a responsible third party, W&M filed Scarlott's first amended petition against NNA, Hurricane Glass, NMAC, and CLN. R.88–R.114. Shortly thereafter, W&M filed Scarlott's unopposed motion for leave to correctly name "Hurricane Auto Care & Accessories" as a party defendant. R.205–R.208.

**M.    NMAC removed this matter to the district court. But despite W&M's early suggestion that it lacked subject matter jurisdiction over Scarlott's claims, the district court refused to remand this matter to the state court.**

Over a year after W&M filed Scarlott's original petition, but less than three weeks after W&M filed Scarlott's motion for summary judgment in the state court, NMAC removed this matter to the district court. R.22–R.25; R.31.

At a status conference shortly thereafter W&M informed the district court that it lacked subject matter jurisdiction over Scarlott's claims. R.5095, 15–17. The district court, however, dismissed W&M's concern: "It's too late. . . . I will dismiss this case, but not for want of jurisdiction. Is that clear?" R.5099, 15, 24–25. Later, W&M filed Scarlott's motion to remand this matter to the state court. R.2824–R.2839.

**N.    During his deposition, Neil Barnes—NNA's designated corporate representative—acknowledged that if the BCM in the Murano didn't power down it could have caused the drain to the Murano's battery.**

After NMAC removed this matter to the district court, W&M deposed Barnes. R.3725. During his deposition, Barnes described the BCM in the Murano as a factory-installed piece of hardware that controls, among other components, "turn signals, dome lights, [and] other lights in the car." R.3896:1–20. Barnes later acknowledged that if the BCM in the Murano did not power down, it could have caused the drain to the Murano's battery. R.3897:8–13.

14

**O.    Through his expert report, Ryan Schooley—NNA's expert—confirmed that he was "aware of instances where the BCM would not 'go to sleep' thereby resulting in a battery drain."**

Following Barnes's deposition, NNA filed Schooley's expert report. R.411–R.422. Through it, Schooley confirmed that he was "aware of instances where the BCM would not 'go to sleep' thereby resulting in a battery drain." R.420. He also stated that the Murano's BCM was eligible for coverage under the Protection Plan that Scarlott purchased, R.421—which covered repairs "due solely to defects in Nissan materials or faulty workmanship for which Nissan is responsible." R.1626; R.1822.

Notwithstanding, Schooley opined that Hurricane remedied the cause of the Murano's electrical problems when it "installed a diode in order to prevent the battery drain from occurring." R.417.

**P.    During his deposition, Srinivasa "Sam" Gogineni—Hurricane's owner—made clear that Hurricane never installed a diode in the Homelink mirror.**

Two months after NNA filed Schooley's expert report, NNA's counsel deposed Mr. Gogineni. R.3949. During his deposition, Mr. Gogineni testified that Hurricane *never* installed a diode in the Homelink mirror. R.4027:8–12; R.4044:13–21; R.4045:13–15; R.4046:10–11.

**Q.    Through its amended motion for summary judgment, and for the first time, NNA contended that the installation of the Homelink mirror was the cause of the Murano's electrical problems.**

Through its amended motion for summary judgment NNA changed course, and began to argue that the installation of the Homelink mirror caused the Murano's electrical problems—a theory quite contrary to its original argument that "the installation of the mirror is *not* the cause of the battery draining." R.869 (emphasis added). Specifically, NNA suggested that "Hurricane Auto's improper installation [caused] the mirror [to] remain[] on at all times." R.1417; *see also* R.2703–R.2707.

**R.    During his deposition, Schooley admitted that the Homelink mirror did *not* remain on at all times. He also confirmed—for the second time— that he was aware that BCMs in Muranos were known to "not fall asleep."**

When W&M deposed Schooley he conceded that the Homelink mirror did not remain on at all times, R.2721–R.2725; R.2732–R2733. And after that, he testified that it would take a constant draw of "500 milliamps over the course of a week" to draw the Murano's battery down to the point that it would "not crank." R.520:10–20.

Schooley also admitted that a malfunctioning BCM can cause a draw on the battery. R.506:2–5. Further, in his expert report, he stated: I am aware of instances where the BCM would not 'go to sleep,' thereby resulting in a battery drain." R.421.

**S.    W&M discovered that the Homelink mirror that Hurricane installed in the Murano could not have drawn more than 450 milliamps from its battery at any time.**

After Schooley's deposition, W&M conducted additional discovery, and learned that the Homelink mirror could not have drawn from the Murano's battery more than 450 milliamps at any time. In fact, its typical draw would have been much closer to 350 milliamps. R.1992.

**T.    Stephen Weaver—Scarlott's expert—concluded that the Murano's electrical problems were caused by defects in NNA components.**

Following an inspection of the Murano, Weaver concluded that the Murano "had multiple defects since purchase." R.1919. Upon examination by NNA's counsel, Weaver again stated that the problems Scarlott experienced with the Murano's electrical system were due to defects that existed on the date that Scarlott purchased it. R.1928:5–8, 14–18.

**U.    Scarlott's research revealed many, many complaints about the very same problems she experienced with the Murano.**

As a result of her repeated visits to CLN, Scarlott conducted her own internet research, which revealed pages of online consumer complaints about the very same problems that she experienced with the Murano. R.3406.

Additionally, a representative from AAA who helped Scarlott start the Murano on one occasion, informed her that "he had personally had to go out and

jump start at least ten Muranos in the past 2 to 3 months and that he felt it might be some type of defect with the vehicle itself." R.2758, 15.

## V.    The district court conceded that CLN never fixed the Murano's electrical problems.

During the district court's last hearing, it stated: "I don't know what's wrong with the car. I've never known what's wrong with the car." R.5200, 14–15. It later explained: "There is a problem. Nobody knows what the problem is." R.5239, 20–21.

## Summary of the Argument

From the outset, the district court lacked subject matter jurisdiction over Scarlott's claims. This is because the amount in controversy could not have satisfied the MMWA's threshold jurisdictional requirement. The district court therefore erred in refusing to remand this matter to the state court. And this Court should accordingly vacate the district court's orders and judgment, as it never had authority to hear this case.

Notwithstanding, to the extent that the district court had subject matter jurisdiction over this matter, it erred in granting NNA's motion for summary judgment. This is because W&M presented evidence to support each element underlying Scarlott's claims for breach of express and implied warranties. In fact, the district court appeared to agree that W&M did so. Nonetheless, it entered judgment against Scarlott based on NNA's affirmative defense—for which NNA

bore the burden of proof—that a non-NNA component caused the Murano's electrical problems.

W&M, however, submitted not only written documentation, but testimony from four witnesses, showing that NNA components likely caused the Murano's electrical problems. What's more, NNA covered repairs to correct the Murano's electrical problems under its warranty—which covered *only* repairs needed to correct defects in NNA components. So at the very least, a genuine issue of material fact existed as to the cause of the Murano's electrical problems. The district court, therefore, could not have properly entered summary judgment in favor of NNA. And it follows, for this and other reasons, that the district court could not have properly sanctioned Scarlott, W&M, and Noah Radbil for proceeding with Scarlott's claims against NNA.

Similarly, if the district court had the power to hear this matter, it erred in granting Hurricane's motion to summary judgment. This is because Scarlott filed her claim against Hurricane within the applicable two-year statute of limitations. In particular, she filed it approximately one year after CLN first advised her that the cause of the Murano's electrical problems was the Homelink mirror. Noteworthy, before CLN did so, it consistently informed Scarlott that the cause of the Murano's electrical problems was *not* the Homelink mirror. Scarlott's claim against Hurricane was therefore not "untimely." And because it was not, the district court

could not have properly granted Hurricane's motion for summary judgment. For the same reason, among others, the district court could not have properly sanctioned Scarlott, W&M, and Noah Radbil for litigating Scarlott's claim against Hurricane.

## Argument

I.    **The district court lacked subject matter jurisdiction over this matter. It therefore erred in denying Scarlott's motion to remand.**

A.    **This Court must review the district court's refusal to remand this matter to the state court *de novo*.**

"We review a district court's denial of a motion to remand for lack of subject matter jurisdiction *de novo*." *Hood ex rel. Mississippi v. JP Morgan Chase & Co.*, 737 F.3d 78, 84 (5th Cir. 2013).

B.    **An action under the MMWA may not proceed in a federal court if the amount in controversy is less than $50,000. Because the amount in controversy here is at most $31,881.00, the district court lacked subject matter jurisdiction over Scarlott's claims.**

NMAC removed this matter to the district court under 28 U.S.C. § 1331. R.22, 1. In doing so, it presupposed that the district court had subject matter jurisdiction over Scarlott's action simply because it "ar[o]se under the federal Magnuson-Moss Warranty Act." R.23, 4. NMAC, however, failed to consider that the MMWA expressly precludes federal courts from hearing matters under it "if the amount in controversy is less than the sum or value of $50,000." 15 U.S.C.

§ 2310(d)(1). For purposes of the MMWA's jurisdictional limitation, the amount in controversy here is at most $31,881.00.

W&M brought this jurisdictional deficiency to the district court's attention shortly after NMAC removed this matter. But the district court brushed it aside, noting: "It's too late." R.5099, 15. Subject matter jurisdiction is, however, an issue that "can never be forfeited or waived." *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 69 (2009).

> **1.    The amount in controversy for purposes of a plaintiff's claim under the MMWA is, at most, the value of the subject vehicle. Here, because the sales price of the Murano was $31,881.00, the amount in controversy could not have satisfied the MMWA's jurisdictional requirement.**

The MMWA permits a plaintiff to "bring suit for damages and other equitable relief" in a state or federal court. 15 U.S.C. § 2310(d)(1). But it also limits the jurisdiction of federal courts by expressly providing that a plaintiff's cause of action may not proceed in a federal court if the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in th[e] suit." 15 U.S.C. § 2310(d)(3)(B).

Federal circuit courts of appeals have unanimously interpreted the phrase "all claims" to mean only those brought specifically under the MMWA. *See* 9

ROBERT HAIG, BUS. & COM. LITIG. IN FED. CTS. § 101:136 (3d ed.). In fact, this Court appears to have been the first to address the issue. In *Boelens v. Redman Homes, Inc.*, it reasoned that the amount in controversy requirement found at Section 2310 of the MMWA does not include damages arising from pendant state law claims. 748 F.2d 1058, 1071 (5th Cir. 1984). The Eleventh Circuit subsequently agreed: "[T]he amount in controversy for purposes of Act § 2310(d)(3)(B) does not include damages flowing from any pendent state law claim brought by a plaintiff." *Ansari v. Bella Auto. Grp., Inc.*, 145 F.3d 1270, 1272 (11th Cir. 1998). And the Fourth Circuit agreed as well: "The aggregate amount in controversy, however, is not computed on the basis of pendent state law claims." *Misel v. Mazda Motor of Am., Inc.*, 420 F. App'x 272, 274 (4th Cir. 2011). Most recently, the D.C. Circuit confirmed that "[d]espite the loose reference to 'all claims to be determined in [the] suit,' *id.*, properly read, the statute only permits the district court to aggregate the value of all claims *asserted under the Magnuson–Moss Act* in determining whether the jurisdictional minimum has been met." *Abedrabbo v. Topps Meat Co., LLC*, 756 F. Supp. 2d 18, 23 (D.D.C. 2010).

So how must a court calculate the value of all claims under the MMWA in the context of an action for breach of warranty? To start, a plaintiff's recovery resulting from such an action is limited to the cost of cover. *Gardynski-Leschuck v. Ford Motor Co.*, 142 F.3d 955, 957 (7th Cir. 1998). In the case of a defective

vehicle, the cost of cover is "the replacement price—the price of a new car less the value of the used vehicle returned to [the defendant] . . . *less* the value of the use [the plaintiff] obtained." *Id*. A plaintiff may not recover incidental and consequential damages, such as loss of use, or aggravation and inconvenience, on top of the cost of cover, *id*. at 957–58, as doing so would be "double counting." *Id*. at 957. Consequently, "[a]t most, recovery under the MMWA is the value of the vehicle at issue." *Roxbury v. Gulf Stream Coach, Inc.*, No. CIV A 07-6046(MLC), 2008 WL 4307113, at *2 (D.N.J. Sept. 15, 2008).

Against this backdrop the Seventh Circuit reasoned that the amount in controversy for purposes of a plaintiff's claim under the MMWA is no more than the value of the subject vehicle. *See Gardynski-Leschuck*, 142 F.3d at 957–59. This, of course, assumes the unlikely circumstance that the subject automobile has no value, and that the plaintiff obtained no use from it. *See id*. The Third Circuit later agreed with the Seventh Circuit's analysis: "[T]he party asserting federal jurisdiction must allege the cost of the replacement vehicle, minus both the present value of the allegedly defective vehicle and the value that the plaintiff received from the allegedly defective vehicle." *Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 402 (3d Cir. 2004) (quotation omitted). The Sixth Circuit subsequently adopted the same position in holding that the amount in controversy is calculated by determining the difference between the cost of a replacement vehicle, and the

present value of the subject vehicle, less the value the plaintiff obtained from the subject vehicle. *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 885 (6th Cir. 2005).[2]

Noteworthy, each of these courts, in one way or another, acknowledged that attorneys' fees do not count toward the MMWA's jurisdictional amount. But none of them made the point so clear as did this Court: "Nor may the claim for attorneys fees be used to satisfy the jurisdictional amount, because § 2310(d)(3) requires that the amount in controversy be calculated 'exclusive of interests and costs.' Attorneys fees are 'costs' within the meaning of § 2310(d)(3)." *Boelens*, 748 F.2d at 1069 (citation omitted).

All of this therefore means that amount in controversy here could not have been more than $31,881.00—the "sale price of the [Murano]." R.1817. Remarkably, despite its refusal to remand this matter to the state court, the district court actually seemed to agree: "That car turns out not to have been worth $35,000.00." R.5239, 19–20.

So just as W&M suggested to the district court during an early status conference, and in line with the motion to remand that W&M later filed, the amount in controversy here could not have satisfied the MMWA's $50,000

---

[2]     Examples of the appropriate application of the amount in controversy calculation are quite prevalent. *See*, *e.g.*, *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 406 (7th Cir. 2004); *Messana v. Mercedes-Benz of N. Am., Inc.*, 5 F. App'x 522, 524 (7th Cir. 2001).

jurisdictional requirement. As a result, the district court did not have subject matter jurisdiction over this matter.

> **2.    A plaintiff's discovery control plan does not affect the amount in controversy for federal jurisdictional purposes. The district court's suggestion otherwise is incorrect.**

In support of its ruling denying Scarlott's motion to remand, the district court wrote: "At the time of removal, Scarlott's first amended petition prayed for 'monetary relief totaling $50,000 or less . . . excluding court costs, prejudgment interest and attorney fees.' Because she pleaded damages of $50,000, she expressly invoked this court's jurisdiction." R.2979.

To start, the district court's recounting is inaccurate. The reference to "$50,000 or less" found in Scarlott's amended petition was not a prayer for relief. Rather, it was part of her notice of election of a discovery control plan, which the Texas Rules of Civil Procedure required her to make. *See* Tex. R. Civ. P. 190.1. Indeed, the complete, relevant excerpt reads:

### DISCOVERY CONTROL PLAN

> Plaintiff intends that discovery in this case shall be conducted under Level One as set forth in Tex. R. Civ. P. Rule 190.1. This suit involves only monetary relief totaling $50,000 *or less*, excluding court costs, prejudgment interest and attorney's fee.

R.88, 1 (emphasis added).

Of great consequence, a discovery control plan is not binding. In fact, the comments to Tex. R. Civ. P. 190 specifically state: "The initial pleading required

by Rule 190.1 is merely to notify the court and other parties of the plaintiff's intention; it does not determine the applicable discovery level or bind the court or other parties." Tex. R. Civ. Proc., Pt. II, § 9, R. 190, Refs & Annos, cmt. 1 (1999). The comments further make clear that a plaintiff's designation "does not alone make the case subject to" the discovery control level suggested. *Id.*

What's more, the district court previously acknowledged that a plaintiff's choice of discovery level "is insufficient to constitute unequivocal evidence that the amount in controversy exceeds the jurisdictional amount":

> Even assuming the discovery level pleaded by plaintiffs in accordance with the Texas Rules of Civil Procedure is relevant to calculating the amount in controversy for federal jurisdictional purposes, discovery level alone is insufficient to constitute unequivocal evidence that the amount in controversy exceeds the jurisdictional amount.

*Lewis v. Mercedes-Benz USA, LLC*, No. CIV.A. V-11-16, 2011 WL 2442659, at *1 (S.D. Tex. June 14, 2011) (citing *Horton v. Bank One, N.A.*, A-03-CA-150-SS, 2003 WL 25737885, at *2 (W.D. Tex. May 6, 2003)) (quotation omitted).

It therefore seems quite odd that the district court so abruptly abandoned its recent position, and held that Scarlott's discovery control plan—which indicated that her "suit involves only monetary relief totaling $50,000 *or less*," R.88, 1 (emphasis added)—constituted infallible proof that the amount in controversy here was necessarily $50,000 or more.

**3.    But even if Scarlott's discovery control plan was relevant to the amount in controversy, W&M included in her amended petition an unequivocal statement showing that she sought no more than $39,500.00, excluding attorneys' fees and costs.**

Even if the discovery control plan found in Scarlott's amended petition could have somehow, someway affected the amount in controversy in this matter, the district court completely ignored that W&M not only specifically listed the purchase price of the Murano in Scarlott's amended petition, R.93, 27, but also incorporated by reference an explicit demand for an amount less than $50,000: "The specific amount demanded herein for these damages totals $39,500." R.98, 44; R.2833–R.2834.

Because "[t]he general rule is that specific language should trump boilerplate," *In re Sarabia*, No. 06-31109-RCM, 2007 WL 1394388 at *1 n.1 (Bankr. W.D. Tex. May 9, 2007), to the extent that Scarlott's discovery control plan designation was of any consequence to the necessary amount in controversy calculation, her statement that she sought no more than $39,500 in damages was certainly entitled to overriding weight, as specific and exact terms are to be given greater weight than general language. *Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335–36 (2002). Indeed, this Court said so in explaining that "a subsequent specification impliedly limits the meaning of a

preceding generalization." *Friedrich v. Local No. 780, IUE-AFL-CIO-CLC*, 515 F.2d 225, 227 (5th Cir. 1975).

### 4. The district court's implication that W&M strategically waited thirty months to file Scarlott's motion to remand is not true.

The district court took particular care to note that W&M filed Scarlott's motion to remand "[t]hirty months after this case was removed to federal court." R.2964. It failed to mention, however, that W&M called the district court's attention to the jurisdictional deficiency during an early status conference:

> THE COURT:   It's too late. Your opportunity to do it—
>
> W&M:          It is jurisdictional, Your Honor. It is never too late to raise—
>
> THE COURT:   Thank you counsel. You just take however long you want, and you raise it. You just do that. Because there's one thing certain, is you do not want to confront the essence of this case. Now, you have run-up an enormous cost in this Court; and I will dismiss this case, but not for want of jurisdiction. Is that clear?

R.5099, 15–25.

Considering this, the district court's insinuation that W&M sat on its hands for well over two years, and only decided to file Scarlott's motion to remand thirty months after her action had been pending in the district court, seems misplaced.

5.     **The procedural history of this matter demonstrates that Scarlott's motion to remand did not constitute an attempt to "start her case over at the eleventh hour."**

The district court justified its decision to deny Scarlott's motion to remand by suggesting that if it did not do so "[o]ther litigants like Scarlottt could extort settlements by raising the cost to defend against their claims by starting their case over at the eleventh hour." R.2964. Notwithstanding the faulty legal premise on which the district court's statement is based, its concern does not hold water in light of the procedural history underlying this matter.

In particular, W&M filed Scarlott's petition in the state court. R.35–R.44. It then litigated her claims for over a year before NMAC removed this matter to the district court. *See* R.22–R.25. Ironically, NMAC filed its notice of removal less than three weeks after W&M filed Scarlott's motion for summary judgment in the state court, R.31—a motion that neither the state court nor the district court ever ruled on.

So at the end of the day, it seems quite apparent that it was not Scarlott's intention to "rais[e] the cost to defend against [her claims]," or to "extort settlements." Rather, she simply intended to obtain a judgment from the state court.

**II.    W&M presented evidence in support of Scarlott's claims for breach of express and implied warranties. The district court therefore erred in granting NNA's motion for summary judgment. At the very least, a genuine issue of material fact remained for a jury to consider.**

**A.    This Court must review *de novo* the district court's decision to grant NNA's motion for summary judgment.**

"[T]his court reviews *de novo* the grant of summary judgment." *Lowery v. Metro. Transit Auth. of Harris Cnty.*, 54 F. App'x 793, at *1 (5th Cir. 2002). And under Rule 56, summary judgment is proper only where "there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.    W&M presented evidence to support that NNA breached its written warranty by failing to repair the Murano's electrical problems after Scarlott provided it a reasonable number of attempts to do so.**

"[T]he MMWA creates a statutory cause of action for consumers 'damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation [imposed by the Act] or [established by] a written warranty, implied warranty, or service contract.'" *Walton v. Rose Mobile Homes LLC*, 298 F.3d 470, 474 (5th Cir. 2002). Congress created this private cause of action to combat what it characterized as a spreading plague of warrantors refusing to live up to promises they made in connection with the goods they sold. Simply, Congress intended to remedy its finding that "[t]he consumer does not have a readily available or practical means of compelling the manufacturer or the retailer from whom he purchased the appliance or the servicing agency responsible for its maintenance to

perform their respective warranty obligations." H.R. REP. NO. 93-1107, at 24, 26–27 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7705, 7707, 7709–10.

Under the MMWA, a plaintiff may maintain a cause of action for breach of a written warranty where she presents evidence upon which a reasonable jury could find "(1) the existence of a defect in the automobile covered by the warranty; (2) compliance with the terms of the warranty by plaintiff; (3) [that] the plaintiff afforded [the] defendant a reasonable opportunity to repair the defect; and (4) [that the] defendant, [through its authorized dealer], was unable to repair the defect after a reasonable time or a reasonable number of attempts." *Pearson v. DaimlerChrysler Corp.*, 349 Ill. App. 3d 688, 697 (Dist. 1, 2004); *see also* Illinois Pattern Jury Instruction, 185.03.[3]

**1.    W&M presented evidence that NNA covered CLN's repairs to correct the Murano's defective electrical system under its warranty.**

Under its warranty, NNA covered repairs to the Murano's electrical system. *See* R.1474, R.1479, R.1481, R.1486, R.1489, R.1492. In fact, CLN stamped each according repair order with a conspicuous "WARRANTY" designation. *Id*.

Specifically, NNA reimbursed CLN for repairs it made to the Murano's batteries, BCM, dome lights, air bag light, and rear wipers—each of which CLN characterized as an "electrical" repair. *See id*.; R.3732, 165:4–7. NNA's Vehicle

---

[3]    Illinois appears to be the only state to have issued pattern jury instructions for claims under the MMWA.

Claims History for the Murano showed that NNA did so per "standard warranty claim[s]." R.1903–R.1905.

At no point did NNA contest that it covered CLN's repairs to the Murano's electrical system under its warranty. R.3674, 24:7–15. Of note, if NNA would have determined that the repairs did not fall under its warranty coverage, it could have, per the terms of its agreement with CLN, denied any of CLN's "standard warranty claim[s]." R.3771:17–21. NNA did not do so.

Rather, NNA suggested, after-the-fact, that its decision to cover CLN's repairs to the Murano's electrical system under its warranty was a mistake: "NNA paid these claims before it knew of Hurricane Auto's improper installation." R.2095. If, however, NNA truly believed this, it could have, per the terms of its agreement with CLN, demanded that CLN return any money it accepted for repairs to the Murano's electrical system. *See* R.3858:23–R.3859:2. But NNA never made such a demand to CLN. R.3860:18–23.

So despite NNA's hindsight argument that it should not have covered CLN's repairs to the Murano's electrical system under its warranty, it did. And NNA did nothing to correct this supposed mistake, despite the existence of procedures that it specifically created to do just that.

**2.    W&M presented evidence that Scarlott complied with the terms of NNA's warranty.**

NNA's warranty required nothing more of Scarlott than that she "take the [Murano] to an authorized Nissan dealer . . . to obtain warranty service." R.1558. On each occasion that she experienced a problem with the Murano, Scarlott tendered it to CLN. *See* R.1471–R.1494. Not surprisingly, NNA did not contest that Scarlott complied with the terms of its warranty. *See* R.3915:12–18; R.3698, 84:3–16.

**3.    W&M presented evidence that Scarlott provided NNA a reasonable opportunity to repair the Murano's electrical problems.**

Because Scarlott tendered the Murano to CLN for repair on ten ocaasions— seven for electrical repairs—she satisfied her obligation under the MMWA to provide NNA with a reasonable opportunity to repair the Murano's problems. *See Ventura v. Ford Motor Corp.*, 433 A.2d 801, 810 (N.J. 1981). Indeed, NNA admitted that it relies on its network of authorized dealerships to perform repairs to vehicles that it warrants. R.1970 at 21.

**4.    W&M presented evidence that NNA was unable to repair the Murano's electrical problems after Scarlott provided it a reasonable number of attempts to do so.**

The plain language of the MMWA requires a plaintiff to provide the defendant only a "reasonable" opportunity to cure problems with the subject vehicle. 15 U.S.C. § 2310(e). This means that "[a] manufacturer does not have an

unlimited time or an unlimited number of attempts to repair an automobile; rather, the limited warranty is breached and/or fails of its essential purpose if successful repairs are not made within a reasonable time or within a reasonable number of attempts." *Pearson*, 349 Ill. App. 3d at 698.

Stated otherwise, "[t]he buyer of an automobile is not bound to permit the seller to tinker with the article indefinitely in the hope that it may ultimately be made to comply with the warranty." *Orange Motors of Coral Gables v. Dade Cnty. Dairies, Inc.*, 258 So. 2d 319, 321 (Fla. Dist. Ct. App. 1972). Rather, repair efforts are limited under the MMWA to "a reasonable period of time," and "in order to ensure escape from liability, the dealer must effect repairs which are both timely and permanent." John Goren, *Buyer's Right to Revoke Acceptance Against The Automobile Manufacturer For Breach of Its Continuing Warranty of Repair or Replacement*, 7 Ga. L. Rev. 711, 714, 717–718 (1973) (footnotes omitted).

Of course, the MMWA does not define "reasonable number of repair attempts." This is because committee comments to the MMWA indicate that the number of repair attempts that are "reasonable" in any particular case is an issue of material fact to be decided by a jury. H.R. REP. NO. 93-1107 (1974); H.R. REP. NO. 93-1606 (1974).

Here, Scarlott tendered the Murano to CLN for repair to its electrical system on seven separate occasions. R.1469–R.1494; R.1909–R.1911; R.1916–R.1917. In all, Scarlott was without use of the Murano for fifty-three days. R.1471–R.1494.

Gore accordingly explained: "It was a tough deal. You take the good and the bad, and this just happened to be one of the ones that was hard to fix. . . . I knew it was a problem, but we just couldn't find it. R.3715, 123:24–124:1; R.3728, 155:4–5. He also recalled: "So here it is about the fourth time, and—and at this point, [Scarlott] is very upset. At this point she is. You know, she's coming in, 'Bob, I'm done with this. I'm tired of it,' dah, dah, dah. Rightly so. I mean, if I had one left me sitting on the road that many times, I'd be mad, too." R.3722, 141:8–14.

But despite CLN's repeated efforts to repair the Murano's electrical problems, it was never able to do so. In fact, the district court seemed to agree. R.5236, 19–24. What's more, that CLN failed to repair the Murano's electrical problems is evidenced, if by nothing else, than the simple fact that Scarlott continued to experience the same problems for which she repeatedly tendered the Murano for repair even after CLN's attempts to correct the problems. In particular, the Murano failed to start on at least five occasions after CLN last returned it to Scarlott, supposedly "with no electrical draw on system." R.1916.[4]

---

[4] The district court denied, without any reasoning, W&M's request to supplement Scarlott's response to NNA's amended motion for summary judgment with facts that transpired after briefing had concluded. R.2822.

So because CLN's seven failed attempts to correct the Murano's electrical problems satisfied the MMWA's reasonableness threshold—which is "two, and possibly three," *Marchionna v. Ford Motor Co.*, No. 94 C 275, 1995 WL 476591, at *1 (N.D. Ill. Aug. 10, 1995)—whether Scarlott provided NNA a reasonable number of repair attempts to repair the problems that Scarlott experienced with the Murano was, at the very least, a question for the jury.

> **5.    W&M presented evidence that the Murano's electrical problems were caused by defective NNA components. In granting NNA's motion for summary judgment, the district court therefore ignored what was at least a genuine issue of material fact.**

The district court granted NNA's motion for summary judgment not because it found a necessary element of Scarlott's claim for breach of express warranty lacking, but because it found—as a matter of absolute fact—that the cause of the Murano's electrical problems was something other than defective NNA components: "The only significant problem with the car was the electrical system. That was not covered by the warranty because it was caused by aftermarket parts." R.2962.

But the district court's finding seems quite odd in light of its subsequent statement that it did not know the cause of the Murano's electrical problems: "I don't know what's wrong with the car. I've never known what's wrong with the car." R.5200, 14–15. And it seems evermore strange against the backdrop of its

similar announcement that no one knew the cause of the Murano's electrical problems: "There is a problem. Nobody knows what the problem is." R.5239, 20–21.

No matter, contrary to the district court's finding, W&M presented evidence that the Murano's electrical problems were caused by defective NNA components. And even though NNA suggested otherwise, the issue was, if nothing more, one of disputed fact.

> **i.    By covering CLN's repairs to correct the Murano's electrical problems under its warranty, NNA admitted the problems were caused by defects in its materials or workmanship.**

A plaintiff "establishes a prima facie case of breach of an express warranty" by offering "credible evidence that the defect is materials or workmanship related." *Universal Motors, Inc. v. Waldock*, 719 P.2d 254, 259 (Alaska 1986). Once a plaintiff makes such a showing under the MMWA, the burden then shifts to the defendant to demonstrate otherwise. *Id.* Noteworthy, analogous state lemon statutes read similarly: "It is an affirmative defense to any claim under this article that . . . a nonconformity is the result of abuse, neglect or unauthorized modifications or alterations of the motor vehicle." A.R.S. § 44-1263(B)(2).

Correspondingly, this Court has explained that a plaintiff may prove the existence of a defect through circumstantial evidence. *Nat'l Dairy Products Corp.*, 414 F.2d 682, 687 (5th Cir. 1969); *Holcomb v. Cessna Aircraft Co.*, 439 F.2d

1150, 1153 (5th Cir. 1971). And because a plaintiff may do so, her "evidence need not negate all other possible causes." *Porter v. Am. Optical Corp.*, 641 F.2d 1128, 1142 (5th Cir. 1981).

In the case of a defective vehicle, a manufacturer's repair to a factory component, under a warranty that covers only "repairs or replacements necessary to correct defects in material or workmanship," constitutes circumstantial evidence of a defect. *Milicevic v. Fletcher Jones Imports, Ltd.*, 402 F.3d 912, 919 (9th Cir. 2005). In fact, it means that the manufacturer "admitted the defective nature of these conditions." *Id*. For example, in *Milicevic*, the Ninth Circuit explained that "[b]y attempting to repair the rear window seal and the brakes under warranty [which covered only defects in materials or workmanship], Mercedes admitted the defective nature of these conditions." *Id*. at 919.

Here, NNA covered CLN's repairs to correct the Murano's electrical problems under its warranty. *See* R.1469–R.1494. Of the utmost significance, NNA's warranty covers *only* "repairs needed to correct defects in materials or workmanship of all parts and components of each new vehicle supplied by Nissan." R.1557.

Additionally, Schooley included a statement in his expert report that CLN's "replacement of the BCM was eligible for coverage under the Security+Plus Plan." R.421. NNA's Vehicle Claims History for the Murano supports Schooley's

conclusion. R.1903–R.1907. Notably, the Protection Plan covers *only* "repair[s] to replace all covered parts of [the Murano] . . . due solely to defects in Nissan materials or faulty workmanship for which Nissan is responsible." R.1626.

Therefore, by repairing the Murano's electrical problems under its warranty and the Protection Plan, NNA admitted—or at the very least created an issue of material fact—that the Murano's electrical problems were caused by defects in its materials or workmanship. This is only logical as NNA certainly would not reimburse CLN for repairs, under a warranty and service plan that covered repairs "due solely to defects in Nissan materials or faulty workmanship for which Nissan is responsible," if the underlying cause of the problem was not an NNA component for which NNA was responsible.

> **ii.      Testimony from each of NNA's three witnesses corroborated that the Murano's defective BCM—an NNA component—could very well have caused the Murano's electrical problems.**

Barnes described the BCM in the Murano as a factory-installed piece of hardware that controls, among other components, "turn signals, dome lights, [and] other lights in the car." R.3896:17–18. Schooley similarly explained that the BCM controls, among other components, the Murano's interior lights, door locks, remote locks, and windshield wipers. *See* R.3403.

Important, both Barnes and Schooley agreed that a defective BCM could have caused the Murano's electrical problems. In particular, Barnes acknowledged

that if the BCM in the Murano didn't fall asleep, it could have caused the drain to the Murano's battery: "If the BCM is not powering down, if it's still powered up like it would be with the ignition switch turned on, yes, it could." R.3897:11–13. And like Barnes, Schooley admitted that a malfunctioning BCM can cause a draw on the battery. R.506:2–5. Possibly more important, Schooley stated: "I am aware of instances where the BCM would not 'go to sleep,' thereby resulting in a battery drain." R.421.

In line with Barnes's and Schooley's acknowledgments, Gore revealed that an NNA Dealer Technical Specialist—who he later referred to as "a Nissan engineer," R.3725, 148:9–10—advised him: "When you've got a known issue— you got GTR or a Murano with a battery going dead, just fan them, put a BCM in there, because they're waking up and zapping the batteries." R.3724, 145:11–14. Gore later confirmed that CLN repaired the Murano's BCM, under NNA's warranty, because NNA "came out with a deal on Muranos and GTRs if you got a phantom battery drain, is to replace the BCM." R.3723, 144:25–145:2. Gore additionally divulged that after he learned of NNA's suggested repair to the Murano's BCM, he called Scarlott, and said: "Guess what? I found your problem." R.3724, 145:18–19.

### iii.    Weaver concluded that the Murano's electrical problems were caused by defects in NNA components.

Following an inspection of the Murano—something that neither Barnes nor Schooley performed—Weaver concluded that the Murano "had multiple defects since purchase." R.1919. Upon examination by NNA's counsel, Weaver again stated that the problems Scarlott experienced with the Murano's electrical system were due to defects that existed on the date that Scarlott purchased it. R.1928:5–8, 14–18.

### 6.    Notwithstanding, the MMWA did not, as the district court insinuated, require Scarlott to identify the exact cause of the Murano's electrical problems. Rather, W&M was simply required to demonstrate a malfunction.

Scarlott need not have correctly identified the exact cause of the Murano's electrical problems. The Northern District of Illinois made this clear:

> The defect in the Volante was that the driver's door would not open. Soldinger reported this to Lake Forest. The court will not read the [MMWA] to require that the purchaser of a vehicle must correctly identify the cause and source of all automotive defects. The average consumer should not be expected to acquire the expertise of an automotive mechanic in order to receive protection under a written warranty.

*Larry J. Soldinger Assocs., Ltd. v. Aston Martin Lagonda of N. Am., Inc.*, No. 97 C 7792, 1999 WL 756174, at *6 (N.D. Ill. Sept. 13, 1999).

The Florida District Court of Appeal similarly stated:

> Porsche also argues that it was entitled to a directed verdict because Mason did not prove that any *particular* component

> was defective. However, it appears that, because the Warranty
> Act allows for proof of a defect *or* malfunction, it is enough to
> prove the existence of a malfunction. Identifying the particular
> component part is unnecessary.

*Mason v. Porsche Cars of N. Am., Inc.*, 688 So. 2d 361, 367 (Fla. Dist. Ct. App. 1997).

The district court, in suggesting that Scarlott must have proved the "cause" of the problem, as opposed to presenting evidence that demonstrated "the problem," R.5226, 23–25, therefore misconstrued the applicable standard.

### C.    W&M presented evidence that NNA breached its implied warranty of merchantability as the Murano was not fit for the ordinary purpose for which it was to be used.

The MMWA states that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under . . . [an] implied warranty . . . may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1). Further, an implied warranty is a function of state law. 15 U.S.C. § 2301(7); *see also* 16 C.F.R. § 701.1(d).

In Texas, to be merchantable, goods must be fit for the ordinary purposes for which they are used. TEX. BUS. & COM. CODE ANN. § 2.314(b)(3) (2013). Accordingly, to establish a breach of an implied warranty of merchantability, a plaintiff may show that the product has a defect that renders it unfit for its ordinary purpose; that is, the product lacks something necessary for it to be adequate. *Gen. Motors Corp. v. Brewer*, 966 S.W.2d 56, 57 (Tex. 1998). A product lacks

something necessary for adequacy when it does not accomplish the purpose for which it was manufactured or when it is not constructed in a manner that allows it to accomplish its purpose safely. *Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*, 995 S.W. 2d 661, 665 (Tex. 1999).

In the context of a vehicle, a plaintiff may prove a breach of an implied warranty of merchantability by showing that it contains one big manufacturing defect, such as a faulty transmission, or a multitude of smaller defects that, in sum, render it unusable in one way or another. *See generally* BARKLEY CLARK & CHRISTOPHER SMITH, THE LAW OF PRODUCT WARRANTIES (2008). In either case, the manufacturing glitch separates the product in question from other units of the same class, thus making it unfit for ordinary purposes. *Id.*

Shortly after taking possession of the Murano, Scarlott experienced problems with its electrical system. *See* R.1471–R.1494. As a result of these problems, Scarlott was stranded by the Murano on several occasions. R.4151, 247:7–248:25, R.4152, 249:1–17; R.2757–R.2759. And as a result of CLN's repeated, yet unsuccessful attempts to correct the Murano's electrical problems, Scarlott was without the Murano for nearly two months. *See* R.1471–R1494.

Consequently, because the ordinary purpose for which a $31,881.00 vehicle is used is, at a minimum, something other than having "left [Scarlott] sitting on the

road that many times," R.3722, 141:12–14, the Murano lacked something

necessary for it to be adequate.

**III.  W&M filed Scarlott's claim against Hurricane within two years of the date that she knew, or should have known, of the facts giving rise to it. The district court therefore erred in dismissing Scarlott's claim against Hurricane because it was "brought too late."**

> **A.    This Court must review *de novo* the district court's decision to grant Hurricane's motion for summary judgment.**

"We review the grant of summary judgment de novo, using the same criteria

used by the district court in the first instance. *F.D.I.C. v. Dawson*, 4 F.3d 1303,

1306 (5th Cir. 1993). Important, then, "when a cause of action accrues is a

question of law, not fact." *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d

562, 567 (Tex. 2001).

> **B.    The discovery rule tolled the two year statute of limitations that applied to Scarlott's claim against Hurricane until the date on which CLN informed her that the cause of the Murano's electrical problems was the Homelink mirror. W&M filed Scarlott's claim against Hurricane well within two years of this date.**

A two-year statute of limitations applies to a plaintiff's claim for negligence.

*Burke v. Ins. Auto Auctions Corp.*, 169 S.W.3d 771, 776 (Tex. App. 2005).

Typically, this period begins to run "when a wrongful act causes some legal

injury." *TIG Ins. Co. v. Aon Re, Inc.*, 521 F.3d 351, 357 (5th Cir. 2008) (citing *S.V.

v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996)). The discovery rule, however, "defer[s]

accrual of a cause of action until the plaintiff knew or, exercising reasonable

diligence, should have known of the facts giving rise to a cause of action." *Id.* (citing *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998)).

Here, Scarlott took possession of the Murano in December of 2006. R.1812–R.1820. She subsequently tendered it to CLN for repair to its defective electrical system on seven separate occasions. *See* R.1471–R1494. During this time, Scarlott pleaded with CLN to determine the cause of the Murano's electrical problems. For example, on one occasion Scarlott wrote: "Until they can tell me definitively what the problem is and admit that *it is NOT the battery*—and pinpoint the true problem and FIX IT—then the vehicle will have to be replaced . . . ." R.2016. On another occasion, Scarlott wrote:

> I met with your GM, Mr. Brooks this morning and discussed the issues with the Murano. He indicated that he would call the national Nissan tech center and try to get someone to check and see if this type of occurrence has happened before, and if so, how it was remedied, and then get back to me.
>
> I also suggested that if that does not bear fruit, then I would like to have the vehicle taken to an independent diagnostics center of my choosing, at Nissan's expense; to have it thoroughly tested and diagnosed.

R.2017.

Despite all of this, not until November 30, 2009 did CLN inform Scarlott that it believed the cause of the Murano's electrical problems was the Homelink mirror. R.1494. In fact, prior to this time CLN had on more than one occasion informed Scarlott that the Homelink mirror was *not* the cause of the Murano's

electrical problems: "They also told me multiple times that it wasn't the mirror, that they had tested it, and that it was not the mirror." R.4124, 137:14–16.

What's more, Gore explained that before late 2009 neither Scarlott, nor CLN, had any reason to believe that the Homelink mirror could have been the cause of the Murano's electrical problems: "Be honest with you, I wouldn't even think the aftermarket parts, to be honest with you. Because, one, you're never going to have an issue." R.3723, 144:21–24.

Accordingly, the discovery rule tolled the statute of limitations for Scarlott's claims against Hurricane until CLN informed her on November 30, 2009 that it believed the cause of the Murano's electrical problems was the Homelink mirror. W&M filed Scarlott's claims against Hurricane on January 20, 2011. R.239–R.265. As a result, Scarlott's claim against Hurricane was timely.

**IV.    Neither W&M nor Noah Radbil unreasonably extended proceedings regarding NNA. Consequently, the district court's decision to award NNA sanctions, under 28 U.S.C. § 1927 and its inherent authority, was not justified.**

    **A.    This Court must review the district court's decision to impose sanctions against W&M and Noah Radbil for abuse of discretion.**

"We review a district court's imposition or denial of sanctions for abuse of discretion. *Religious Tech. Ctr. v. Liebreich*, 98 F. App'x 979, 981 (5th Cir. 2004)."

46

**B.    The district court's decision to sanction W&M and Noah Radbil, under 28 U.S.C. § 1927 and its inherent authority was not justified, as they neither acted with bad faith nor improper motive.**

Section 1927 is a means for imposing sanctions on lawyers "who unreasonably extend court proceedings" in an attempt to limit "the abuse of court processes." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 757, 762 (1980). Punishment under Section 1927 is therefore "sparingly applied." *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 535 (5th Cir. 1996). This Court has accordingly made clear: "We therefore are mindful that we should not perfunctorily assess damages against [a litigant's] attorney." *Hagerty v. Succession of Clement*, 749 F.2d 217, 222 (5th Cir. 1984), *cert. denied*, 474 U.S. 968 (1985).

As well, a strict construction of Section 1927 is necessary to prevent the prospect of sanctions from chilling the good faith assertion of colorable claims. *In re Silica Products Liab. Litig.*, 398 F. Supp. 2d 563, 673 (S.D. Tex. 2005) (citing *Edwards v. Gen. Motors Corp.*, 153 F.3d 242, 246 (5th Cir. 1998)). Enforcement of Section 1927 must not "dampen the legitimate zeal of an attorney in representing his client." *Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc.*, 38 F.3d 1414, 1416 (5th Cir. 1994).

Here, the district court's order granting NNA's motion for sanctions reads: "Nissan North America, Inc. recovers $180,000 in attorneys' fees and costs jointly

and severally from Noah Radbil and Weisberg & Meyers, LLC." R.4937.[5] It does not include any analysis justifying the district court's decision. And while the transcript of the district court's hearing on NNA's motion for sanctions provides some insight into the district court's thought process, it fails to detail the specific reasoning underlying its decision to grant NNA's motion for sanctions in full. *See* R.5170–R.5261.

Therefore, it seems fair to assume that the district court simply agreed with the argument that NNA's counsel submitted in connection with its request for sanctions,[6] which NNA's counsel summarized as follows:

> [C]ounsel for NNA sent a written correspondence to [W&M], advising them that, based upon NNA's investigation, the aftermarket review mirror caused the Murano's electrical problems, and such was not covered under NNA's new vehicle, limited warranty. NNA also provided [W&M] sworn testimony from [CLN] substantiating same. Yet, [W&M] refused to dismiss the suit. . . . Had [W&M] considered NNA's explanation and evidence provided early in the litigation, NNA would not have incurred these costs. In this case and others, [W&M] ha[s] made a practice of extorting settlements based on the threat of defense costs, regardless of the merits of the case. [W&M's] actions were unreasonable and vexatious, and therefore, [W&M] should be personally liable for all of NNA's fees and expenses, totaling $201,108.81.

R.3150–R.3151.

---

[5]     It also awarded $16,265 to Hurricane. R.4937

[6]     The district court refused to award NNA sanctions under the DTPA.

But neither W&M nor Noah Radbil "acted with bad faith, improper motive or reckless disregard for counsel's duty to the court." *Baulch v. Johns*, 70 F.3d 813, 817 (5th Cir. 1995). Nor did they unreasonably or vexatiously multiply the proceedings, *see Travelers Ins. Co.*, 38 F.3d at 1417, by advancing Scarlott's claims "[w]ithout reasonable or probable cause or excuse." *U.S. v. Gomez*, No. EP–10–CR–1326–KC, 2012 WL 2899715, at *4 (W.D. Tex. July 9, 2012). Quite contrary, throughout the course of this matter W&M and Noah Radbil not only gathered and presented evidence to support each and every aspect of Scarlott's case, *see supra*, Argument, Section II, but they also gathered and presented evidence that undercut both of NNA's counsel's defense theories.

> **1.     W&M and Noah Radbil presented evidence that NNA's counsel's first defense theory—that "the design or manufacture of the mirror itself" was the cause of the Murano's electrical problems—was without merit. After W&M did so, NNA's counsel abandoned its theory, but only after devoting a year of litigation to it.**

The letter that NNA characterizes as "correspondence to Weisberg and Meyers advising them that, based upon NNA's investigation, the aftermarket rearview mirror caused the Murano's electrical problems, and such was not covered under NNA's new vehicle, limited warranty" explicitly stated: "[T]he installation of the mirror is *not* the cause of the battery draining; it is the design or manufacture of the mirror itself." R.869 (emphasis added).

49

NNA's counsel proceeded with this theory for well over a year. And it did so, as it suggested, based on the "sworn testimony from CLN." R.3150. This testimony read: "They acknowledged it was a problem, and they come out and they put a diode in—on the power side, which is—a diode is like a one-way valve. That's what fixed the car." R.3678, 34:11–14. In fact, through its original motion for summary judgment, NNA explained that Hurricane corrected the cause of Scarlott's repeated tow-truck-trips to CLN when it "*installed a diode* allowing electricity to flow to the aftermarket rear view mirror, but preventing the mirror from draining the battery." R.712 (emphasis added).

Hurricane, however, *never* installed a diode in the Homelink mirror. *See* R.4027:8–12; R.4044:13–21; R.4045:13–15; R.4046:10–11. And after Noah Radbil brought this to light during Mr. Gogineni's deposition, NNA's counsel naturally shifted gears. It abandoned its original theory, and moved on to the next one. In particular, it began to argue that the *installation* of the Homelink mirror *was* the cause of the Murano's electrical problems. R.1386. NNA's counsel's new theory differed quite significantly from its original theory—that "the installation of the mirror [wa]s *not* the cause of the battery draining." R.869 (emphasis added).

But without regard for this, in granting NNA's request for sanctions, the district court ordered W&M and Noah Radbil to compensate NNA's counsel for every hour that it spent advancing its first defense theory—which, as it turned out,

lacked any merit whatsoever. This is unjustified as it equates to a finding that W&M and Noah Radbil "unreasonably and vexatiously multiplied the proceedings" by doing nothing more than disproving NNA's counsel's first defense theory—a theory that subsumed an entire year of litigation.

> **2.      W&M and Noah Radbil presented evidence that NNA's counsel's second defense theory—that the *installation* of the Homelink mirror was the cause of the Murano's electrical problems—was also without merit.**

Upon abandoning its first defense theory, NNA's counsel began to argue that the *installation* of the Homelink mirror was the cause of the Murano's electrical problems. In fact, NNA amended its motion for summary judgment to argue: "The unequivocal evidence shows that due to Hurricane Auto's improper installation, the mirror remained on at all times." R.1417.

W&M and Noah Radbil showed, however, that the Homelink mirror did not remain on at all times. In fact, NNA's own witness, Gore—the only one of NNA's three witnesses who actually inspected the Murano—made this exceedingly clear. R.3674, 25:22–26:5; R.3676, 29:4–8, 30:8–13, 24–31:1; R.3699, 90:24; R.3718, 136:23–25; R.3722, 14:6–7; R.3728, 156:3–7. And for this reason alone, NNA's counsel's second defense theory lacked merit.

But even if the Homelink mirror did remain on at all times, Schooley's testimony regarding the amount of power it could have drawn proved that the Homelink mirror could not have, in any event, been the cause of the Murano's

electrical problems. Specifically, Schooley testified that it would take a constant draw of "500 milliamps over the course of a week" to draw the Murano's battery down to the point that it would "not crank." R.510:5–10. After Schooley's deposition, W&M and Noah Radbil conducted additional discovery, and learned that the Homelink mirror could not have drawn from the Murano's battery more than 450 milliamps at any time. R.1992. In fact, its typical draw would have been much closer to 350 milliamps. R.1992. Accordingly, even if the Homelink mirror did remain on at all times, it could not have depleted the Murano's battery in only three days—a circumstance that Scarlott experienced. *See* R.1994. So by simple arithmetic, in connection with Schooley's explanation, W&M and Noah Radbil showed that NNA's theory of a "constant draw" from the Homelink mirror was not viable.

Furthermore, Barnes's and Schooley's testimony that the Murano's BCM controlled many of the electrical components that failed in the Murano additionally demonstrated that the Homelink mirror was in all likelihood not the cause of the Murano's electrical problems. In particular, the Murano's BCM controlled its "turn signals, dome lights, [and] other lights," R.3896:10–20, as well as "door locks, remote locks, and windshield wipers." R.530:25–R.531:16. So when considering the repairs that CLN made to the Murano's electrical system before it replaced the BCM—for example, repairs to correct a malfunctioning rear wiper, s*ee* R.1474

("electrical *** cust[omer] states rear wiper inop[erable]"), and repairs to correct malfunctioning dome lights, s*ee* R.1481 ("electrical *** customer states none of the dome lights work")—it certainly appears that the Murano's BCM was more likely than not the cause of electrical problems that Scarlott experienced. At the very least, this simple circumstance shows that the cause of the Murano's electrical problems was a question for a jury, and that W&M and Noah Radbil did not "abuse court processes" in proceeding with Scarlott's claims.

**V.     Neither W&M nor Noah Radbil unreasonably advanced Scarlott's claim against Hurricane "without reasonable or probable cause or excuse." The district court's decision to award Hurricane sanctions, under 28 U.S.C. § 1927 and its inherent authority, was therefore not justified.**

**A.     To the extent that the district court's decision to award Hurricane sanctions was based on its finding that "Scarlott's claim was brought too late," this Court must review it *de novo*.**

While a "district court's imposition or denial of sanctions" must be reviewed for abuse of discretion, *see Religious Tech. Ctr.*, 98 F. App'x at 981, this Court must "decide questions of law *de novo*." *Hughes Training Inc. v. Cook*, 254 F.3d 588, 592 (5th Cir. 2001). To the extent that the district court's decision to sanction W&M and Noah Radbil rested on nothing more than its finding that "Scarlott's claim was brought too late," R.2962—which is a question of law, *see Holy Cross Church of God in Christ*,  44 S.W.3d at 567—this Court must review the district court's decision *de novo*.

**B.** **The district court's decision to award Hurricane sanctions was not justified as it is not reasonable that Scarlott "should have known" the cause the Murano's electrical problems *before* even CLN—NNA's authorized dealership—made such a determination.**

Under Texas law, the two-year statute of limitations applicable to Scarlott's claim against Hurricane began to accrue only when Scarlott knew, or should have known, the cause of her injury. *See supra*, Argument Section III. Here, NNA's authorized dealership—a facility whose very purpose, in large part, was to repair defective NNA vehicles—did not, until late 2009, come to believe that the Homelink mirror was the cause of the Murano's electrical problems. *See id*. W&M filed Scarlott's claim against Hurricane approximately one year later. *Id*.

No matter, the district court sanctioned W&M and Noah Radbil because "Scarlott's claim was brought too late." R.2962. In other words, the district court held that W&M and Noah Radbil unreasonably and vexatiously multiplied the proceedings relating to Hurricane because they "should have known" the cause the Murano's electrical problems *before* CLN—NNA's authorized dealership—did.

In any event, that the district court ultimately disagreed with W&M's and Noah Radbil's application of the discovery rule does not mean that they acted "without reasonable or probable cause or excuse." Indeed, not even NNA believed this—as evidenced by NNA's counsel's May 5, 2010 letter to W&M, which read: "NNA shall designate Hurricane Glass as a Responsible Third Party. This will

extend the statute of limitations period by 60 days, thereby allowing [Scarlott] to

join the proper party in this lawsuit." R.4949.

What's more, because a defense sounding in a period of limitations is an

affirmative matter that a defendant must raise, even if Scarlott's decision to assert a

claim against Hurricane was based on a gamble that it would not invoke a

limitations period defense—it was not—"[t]he mere fact that this gamble proved

unsuccessful is not a proper basis for imposing sanctions." *Wood v. B.C. Daniels,*

*Inc.*, No. MISC.A. 08-0003-WS-M, 2008 WL 2163921, *3 (S.D. Ala. May 21,

2008).

**VI.    Neither NNA nor Hurricane satisfied their burden in connection with
their requests for hundreds of thousands of dollars in attorneys' fees.
The district court therefore erred in awarding attorneys' fees against
W&M and Noah Radbil.**

   **A.    This Court must review the district court's decision to award
attorneys' fees and costs against W&M and Noah Radbil for
abuse of discretion.**

"We will not overturn the district court's taxation of costs absent a clear

abuse of discretion." *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 334 (5th

Cir. 1995).

**B.     Neither NNA nor Hurricane submitted evidence to support their requests for hundreds of thousands of dollars in attorneys' fees. The district court could therefore not have conducted the inquiry that it was required to undertake.**

"The party seeking to recover attorneys' fees bears the burden of proof on the issue." *Northwinds Abatement, Inc. v. Employers Ins. of Wausau*, 258 F.3d 345, 353 (5th Cir. 2001). This mean that a "fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). To meet this burden, "[t]he party seeking an award of fees should submit evidence supporting the hours worked and rates claimed." *Id.* at 433.

And while "[f]ailing to provide contemporaneous billing statements does not preclude an award of fees per se," a fee applicant must submit "evidence . . . adequate to determine reasonable hours." *La. Power & Light Co.*, 50 F.3d at 325; *see also Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1044 (5th Cir. 2010). This is because the opposing attorneys must be afforded the opportunity to contradict or disprove the evidence. *Northwinds Abatement, Inc.*, 258 F.3d at 353.

In fact, absent contemporaneous billing statements, in order for a court to award attorneys' fees based on testimony from an interested witness, the testimony "must not be contradicted by any other witness or attendant circumstances and the same must be clear, direct and positive, and free from contradiction, inaccuracies

and circumstances tending to cast suspicion thereon." *Id*. Consequently, "courts customarily require the applicant to produce contemporaneous billing records or other sufficient documentation so that the district court can fulfill its duty to examine the application for non compensable hours." *La. Power*, 50 F.3d at 325.

In line with these requirements, the district court has previously advised litigants "that any fee request must be supported by detailed documentation, including itemized billing records, descriptions of the particular tasks completed, and explanations of the experience and qualifications of the attorneys or paralegals who performed them." *Compass Bank v. Villarreal*, No. L–10–8, 2011 WL 1740270, at *16 (S.D. Tex. May 5, 2011); *see also ABB, Inc. v. Pena*, No. L–10–83, 2011 WL 906651, at *5 (S.D. Tex. Mar. 15, 2011).

But here, neither NNA nor Hurricane produced contemporaneous billing statements. Nor did either submit other evidence to support their requests for hundreds of thousands of dollars in attorneys' fees. And despite that W&M called attention to this deficiency, *see* R.2992–R.2995; R.3423–R.3425, neither NNA nor Hurricane took any steps to remedy the inadequacy.

During the district court's last hearing, NNA's counsel attempted to justify its failure by noting: "I brought my billing records to Court." R.5250, 15–16. But it nonetheless refused to allow W&M and Noah Radbil to review the records, R.5250, 20–25. Astonishingly, however, the district court ruled: "So, [NNA] will

recover $180,000 in attorney's fees and costs *because I don't want to audit the costs*." R.5256, 8–10 (emphasis added).

So just as it did in *La. Power & Light*, this Court should find "troubling the district court's decision to decline a full analysis," and it should hold that "[i]t does not appear from this record that the district court determined if particular hours claimed were reasonably expended on the litigation." 50 F.3d at 325.

## VII. Weaver's testimony satisfied Rule 702's requirements. The district court therefore erred in striking it.

### A. This Court must review the district court's decision to strike Weaver's testimony for abuse of discretion.

"This Court reviews the decision to admit or exclude expert testimony for abuse of discretion." *Chan v. Coggins*, 294 F. App'x 934, 936 (5th Cir. 2008).

### B. Weaver based his testimony on "technical" or "other specialized knowledge." Therefore, as the district court did not find Weaver's credentials deficient, his testimony was admissible.

"Under *Daubert*, Rule 702 charges trial courts to act as 'gate-keepers'" to determine whether expert testimony is "both relevant and reliable." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (5th Cir. 2002). But "the trial court's role as gatekeeper [under *Daubert*] is not intended to serve as a replacement for the adversary system." *Id.* Thus, "while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Id.* at 250. Accordingly, "[a]s long as some reasonable indication of qualifications

58

is adduced, the court may admit the evidence without abdicating its gate-keeping function." *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999).

Here, the district court struck Weaver's testimony because he was "unqualified by reason of association with the firm." R.5237, 8–9. In support of its statement, the district court noted that Weaver "writes approximately 100 opinions for Scarlott's lawyer per year—plus more than 200 for other plaintiffs." R.2964. The district court also suggested that Scarlott "didn't hire an expert in this case[,] [W&M] ha[d] one on retainer." R.5196, 15–16.

But that Weaver had previously offered testimony in unrelated matters did not make his testimony in this matter inadmissible. To start, Weaver was qualified to offer expert testimony in this matter. He was an A.S.E. certified master technician, who had over thirty-three years of experience in the automotive industry. R.1271. He additionally had 450 hours of training through General Motors, including "specialized electronics training." R.1271. And, in fact, General Motors awarded him the renowned General Motors Master Technician Award. R.1271; R.3429, 11.

Moreover, Weaver not only worked as an automotive technician, but also as an automotive warranty claims inspector, as well as the district sales and service manager for AC Delco. R.3429, 11. He additionally taught automotive technology at two different schools. R.1271. Noteworthy, two Texas courts had previously

found Weaver's testimony in cases involving vehicle defects reliable and admissible. R.3430, 14.

So while Weaver's previous testimony in unrelated matters might have affected the weight that a jury chose to afford his testimony in this matter, it did not make his testimony inadmissible. Rather, Weaver's previous testimony "relates more to witness credibility and thus the weight of the expert's testimony, than to its admissibility." *Hendrix v. Evenflo Co., Inc.,* 255 F.R.D. 568, 578 (N.D. Fla. 2009); *accord Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Pipitone*, 288 F.3d at 250 (internal quotation omitted). This is only rational, as "[w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts, but the court may not exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." *Id*. at 249. Here, it appears that the district court did just that. *See* R.2964.

**Conclusion**

The district court did not have subject matter jurisdiction over Scarlott's claims. It therefore erred in refusing to remand her action to the state court. Notwithstanding, even if the district court had the authority to hear Scarott's case, it erred in granting summary judgment in favor of both NNA and Hurricane. It similarly erred in awarding sanctions against Scarlott, W&M, and Noah Radbil.

Respectfully submitted,

/s/ Aaron D. Radbil
Aaron D. Radbil
The Law Office of Aaron D. Radbil, PLLC
801 North Brickell Avenue, Suite 900
Miami, Florida  33131
(561) 826-5477
aaron@adrlawoffice.com

## Certificate of Filing and Service

I hereby certify that on this 24th day of January, 2014, I caused this Brief of Appellants to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Giovanna T. Bingham
HARTLINE DACUS BARGER DREYER, L.L.P.
6688 N. Central Expressway, Suite 1000
Dallas, Texas  75206
(214) 346-3784

*Counsel for Appellee*
  *Nissan North America, Incorporated*

Leslie W. Adams
LESLIE ADAMS & ASSOCIATES
3900 Essex Lane, Suite 1111
Houston, Texas  77027
(713) 728-6360

*Counsel for Appellees Hurricane Glass and*
  *Hurricane Auto Care & Accessories, Incorporated*

/s/ Aaron D. Radbil
*Counsel for Appellants*

## Certificate of Compliance

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*13,997*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>January 24, 2014</u>                    /s/ Aaron D. Radbil
                                                                        *Counsel for Appellants*