**NO. 13-20528**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**APRIL SCARLOTT,**

*Plaintiff – Appellant*

**WEISBERG & MEYERS, LLC,**

*Appellant*

*v.*

*NISSAN NORTH AMERICA, INCORPORATED;
HURRICANE GLASS; HURRICANE AUTO CARE
& ACCESSORIES, INCORPORATED,*

*Defendants - Appellees*

---

On Appeal from the United States District Court
For the Southern District of Texas, Houston Division
Trial Court Civil Action No. 4:10-cv-04865

---

**APPELLEE'S BRIEF**

---

JEFFREY S. PATTERSON
State Bar No. 15596700
So. District Bar No. 12446
e-mail: jpatterson@hdbdlaw.com
HARTLINE DACUS BARGER DREYER LLP
6688 North Central Expressway, Suite 1000
Dallas, TX 75206
(214) 369-2100
(214) 369-2118
**ATTORNEY FOR APPELLEE
NISSAN NORTH AMERICA, INC.**

**NO. 13-20528**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**APRIL SCARLOTT,**

*Plaintiff – Appellant*

**WEISBERG & MEYERS, LLC,**

*Appellant*

*v.*

*NISSAN NORTH AMERICA, INCORPORATED;
HURRICANE GLASS; HURRICANE AUTO CARE
& ACCESSORIES, INCORPORATED,*

*Defendants - Appellees*

---

On Appeal from the United States District Court
For the Southern District of Texas, Houston Division
Trial Court Civil Action No. 4:10-cv-04865

---

**CERTIFICATE OF INTERESTED PERSONS**

---

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Nissan North America, Inc.
*Defendant/Appellee*

Hurricane Auto Care & Accessories, Incorporated
*Defendant/Appellee*

April Scarlott
*Plaintiff/Appellant*

Weisberg & Meyers, LLC
*Appellant*

Aaron D. Radbil, The Law Office Of Aaron D. Radbil, PLLC
*Counsel to Plaintiff/Appellants*

Leslie W. Adams
Leslie Adams & Associates
*Counsel to Defendant/Appellee Hurricane Auto Care & Accessories, Incorporated*

Jeffrey S. Patterson
Giovanna Tarantino Bingham
Hartline Dacus Barger Dreyer, LLP
*Counsel to Defendant/Appellee Nissan North America, Incorporated*

/s/ Jeffrey S. Patterson
**Jeffrey S. Patterson**
**Attorney of Record for**
**Defendant/Appellee**
**Nissan North America, Incorporated**

## STATEMENT REGARDING ORAL ARGUMENT

Nissan North America, Inc. ("NNA") requests oral argument in this case, as it will significantly aid the decisional process.  Fed. R. App. P. 34(a)(2). Appellants appeal: (1) the District Court's granting of NNA's Motion for Summary Judgment on Appellant April Scarlott's claims for breach of warranty; (2) the District Court's award of NNA's attorney's fees and costs because Appellant April Scarlott's counsel, Weisberg & Meyers, LLC, multiplied the proceedings unreasonably and vexatiously; (3) the District Court's exclusion of Appellant April Scarlott's designated expert; and (4) the District Court's failure to grant Appellant April Scarlott's Motion to Remand.  Although the decisions being appealed were correctly decided under established law, this case has been pending for more than four years, and the record is voluminous.  Oral argument will likely aid this Court in understanding the extensive history of this case.

## **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ..........................................................................1

STATEMENT OF ISSUES ....................................................................................2

STATEMENT OF THE CASE..............................................................................4

    A.    Scarlott Purchased the Murano and Chose to Install An Aftermarket Homelink Mirror. .................................................. 5

    B.    The Aftermarket Mirror Caused the Electrical Problems.......... 6

    C.    Scarlott's Allegations of Continued Electrical Problems Are Unsubstantiated. ....................................................................... 8

    D.    The Murano's BCM Did Not Cause the Murano's Electrical Problems...................................................................................... 9

    E.    NNA Provided a New Vehicle Limited Warranty................... 10

    F.    Scarlott and her Attorneys Needlessly Continued this Litigation and Misrepresented the Facts to the Trial Court...................... 11

SUMMARY OF THE ARGUMENT ....................................................................13

ARGUMENT ......................................................................................................15

    Issue 1:    The District Court Properly Denied Scarlott's Motion for Remand. ...................................................................................15

    A.    Jurisdiction Must be Assessed at the Time of Removal. ......... 15

    B.    Plaintiff's Complaint Confers Jurisdiction. ............................ 16

    C.    Texas State Law determines the Proper Measure of Damages.18

    D.    Damages under the MMWA are not Limited to the Vehicle's Purchase Price. ....................................................................... 19

    E.    Scarlott's Testimony and Discovery Responses Confirm she Seeks Consequential and Incidental Damages. ....................... 20

    F.    Scarlott's Cited Case Law Does Not Support Remand. .......... 22

    G.    The Discovery Control Plan is the Beginning, not the End of the Jurisdictional Analysis. ..................................................... 23

    Issue 2:    The District Court Properly Granted NNA's Motion for Summary Judgment. ................................................................24

A.    The Mere Fact the Subject Murano has been Repaired is
      Insufficient to Prove Breach of Warranty or Product Defect. . 25

      1.    Scarlott's Airbag Complaint Could Not be Duplicated..25

      2.    A Single Repair to the Dome Light. ...............................26

      3.    The Rear Wipers were Adjusted....................................26

B.    Scarlott Has No Evidence The BCM Caused the Murano's
      Electrical Problems. ................................................................ 26

C.    Scarlott Fails to Address the Faulty Installation of the Homelink
      Mirror as a Cause of the Murano's Electrical Problems.......... 28

D.    Repairs Made to the Murano Are not Concessions of Defect. 30

E.    Scarlott Admits She Has No Claim Against NNA. ................. 33

F.    Scarlott Must Prove Causation and Not Merely a Malfunction.
      .............................................................................................. 34

G.    Scarlott has No Evidence NNA Breached Any Implied
      Warranty................................................................................. 36

H.    Scarlott has No Evidence of Breach of Any Express Warranty.
      .............................................................................................. 37

I.    Scarlott's Magnuson-Moss Claim is Barred Because she Did
      Not Participate in Informal Dispute Resolution. .................... 38

J.    Scarlott's Expert Witness is No Evidence of Defect. .............. 39

      1.    Weaver Does Not Opine as to Vehicle Defect. ..............40

      2.    Weaver's "Theory" is Merely a Hypothesis of Improper
            Repair by the Dealer. .....................................................40

      3.    Weaver Did Not Consider the Host of Evidence Related
            to the Improper Installation of the Aftermarket Homelink
            Mirror..............................................................................41

      4.    Weaver Has Not Eliminated Other Causes for the
            Electrical Issues. ............................................................43

      5.    Weaver's Opinion that All Replaced Parts are Per Se
            Defective is Inadmissible................................................45

K.    Scarlott's Counsel Misrepresents the District Court's Statement.
      .............................................................................................. 48

Issue 3:    Application of the Discovery Rule to Scarlott's Claims against

Hurricane......................................................................................49

Issue 4:    The District Court did not Err in Awarding NNA Costs and
            Fees. .......................................................................................49

    A.      Scarlott Refused to Dismiss Suit Despite Overwhelming
            Evidence the Aftermarket Mirror Caused the Murano's
            Electrical Problems. ............................................................. 49

    B.      The District Court did Not Abuse its Discretion in Awarding
            Fees Pursuant to 28 U.S.C. § 1927. ........................................ 51

    C.      The District Court did Not Abuse its Discretion in Awarding
            NNA's Fees Pursuant to its Inherent Power. ........................... 53

    D.      Weisberg & Meyers has a Pattern of Improperly Prosecuting
            Groundless Claims. ............................................................... 54

Issue 5:    Award of Sanctions to Hurricane.............................................56

Issue 6:    NNA Submitted Thorough Records of Fees and Costs............56

Issue 7:    The District Court Properly Excluded Scarlott's Expert,
            Stephen Weaver. ....................................................................58

    A.      Weaver's Opinions Concerning Alleged Defect are Unreliable
            and thus Inadmissible............................................................ 58

    B.      Weaver's Opinions Concerning Damages are Likewise
            Unreliable............................................................................. 59

CONCLUSION .....................................................................................61

CERTIFICATION .................................................................................62

CERTIFICATE OF FILING AND SERVICE .......................................62

CERTIFICATE OF COMPLIANCE......................................................63

# TABLE OF AUTHORITIES

## CASES

Allen v. R & H Oil and Gas Co., 63 F.3d 1326, 1335 (5th Cir. 1995)............. 15, 16

Boelens v. Redman Homes, 748 F.2d 1058 (5th Cir. 1984)....................................19

Brookter v. GC Servs. Ltd. P'ship, No. H-10-3149, 2011 U.S. Dist. LEXIS 44909, *9 (S.D. Tex. April 26, 2011) ...............................................................................55

Browning v. Kramer, 931 F.2d 340, 345 (5th Cir. 1991) .......................................52

Carroll v. The Jacques Admiralty Law Firm, P.C., 110 F.3d 290, 292 (5th Cir. 1997)...............................................................................................................53

Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)........................................16

Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991) .........................................53

Danielson-Holland v. Standley & Assocs., 512 Fed. Appx., 850, 853-54 (10th Cir. 2013)...............................................................................................................55

Dassigner v. South Central Bell Telephone Co., 505 F.2d 672, 673-74 (5th Cir. 1974)...............................................................................................................16

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590 (1993)........................59

Easter v. Aventis Pasteur, Inc., 358 F. Supp. 2d 574, 567-77 (E.D. Tex. 2005).....44

Edwards v. Gen. Motors Corp., 153 F.3d 242, 246 (5th Cir. 1998)........................51

FDIC v. Conner, 20 F.3d 1376, 1384 (5th Cir. 1994) ...........................................51

Gagnon v. United Technisource, Inc., 607 F.3d 1036, 1044 (5th Cir. 2010)..........58

Garcia v. Texas Instruments, 610 S.W.2d 456, 462 (Tex. 1980) ...........................19

Gardynski-Leschuck v. Ford Motor Co., 142 F.3d 955 (7th Cir. 1998)........... 22, 23

Gen. Elec. Co. v. Joiner, 522 U.S. 136, 118 S. Ct. 512, 519 (1997) ......................42

Howery v. Allstate Ins. Co., 243 F.3d 912, 916 (5th Cir. 2001) ............................16

Kroger Co. v. Betancourt, 996 S.W.2d 353, 358 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ...........................................................................................25

La. Power & Light Co. v. Kellstrom, 50 F.3d 319, 325 (5th Cir. 1995) ................58

Larry J. Soldinger Assocs., Ltd. v. Aston Martin Lagonda of N. Am., Inc., No. 97-C-7792, 1999 U.S. Dist. LEXIS 14765, *17 (N.D. Ill. Sept. 13, 1999) ..............35

Lewis v. Mercedes-Benz USA, No. V-11-16, 2011 WL 2442659, *1 (S.D. Tex. June 14, 2011) .............................................................................................. 23, 24

MacKenzie v. Chrysler Corp., 607 F.2d 1162, 1166 (5th Cir. 1979)......................18

Malautea v. Suzuki Motor Co., Ltd., 987 F.2d 1536, 1544 (11th Cir. 1993)..........51

Manax v. McNamara, 842 F.2d 808, 814 (5th Cir. 1988) ......................................51

Mann v. Boatright, 477 F.3d 1140, 1150 (10th Cir. 2007)......................................53

Mason v. Porsche Cars of N. Am., Inc., 688 So.2d 361, 367 (Fla. Dist. Ct. App. 1997)......................................................................................................................35

Milicevic v. Fletcher Jones Imports, Ltd., 402 F.3d 912 (9th Cir. 2005)......... 31, 32

Northwinds Abatement, Inc. v. Employers Ins. Of Wausau, 258 F.3d 345, 353 (5th Cir. 2001)..............................................................................................................58

Pizel v. Monaco Coach Corp., No. 3:04-CV-286, 2005 U.S. Dist. LEXIS 20079, *3 (N.D. Ind. Sept. 13, 2005) ....................................................................................32

Pizzi v. Nissan Motors Corp., 38 Pa. D. & C.3d 435, 437-38 (1985) ....................39

Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 444 (Tex. 1989)....................36

Ragsdale v. Progressive Voters League, 801 S.W.2d 880, 882 (Tex. 1990) ..........58

Ratliff v. Stewart, 508 F. 3d 225, 235 n. 13 (5th Cir. 2007)....................................51

Rodriguez v. Ed Hicks Imports, 767 S.W.2d 187 (Tex. App.—Corpus Christi 1989, no writ) ........................................................................................................25

Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 319 (7th Cir. 1996) cert. denied, 117 S. Ct. 73 (1996)........................................................................................................43

Sahyers v. Prugh, Holliday & Karatinos, P.L., 560 F.3d 1241, 1245-46 & n.9 (11th Cir. 2009)..............................................................................................................53

Samuel-Bassett v. Kia Motors America, Inc., 357 F.3d 392 (3rd Cir. 2004)... 22, 23

Shafer v. LG Elecs. U.S.A., Inc., No. 4:09-CV-105-Y, 2010 U.S. Dist. LEXIS 144737, *16 (N.D. Tex. Sept. 30, 2010) ..............................................................44

Sheris v. Nissan North America, Inc., No. 07-2516, 2008 U.S. Dist. LEXIS 43664, *22-23 (D.N.J. June 2, 2008) ..............................................................................39

Signal Oil & Gas Co. v. Universal Oil Prods., 572 S.W.2d 320, 326 (Tex. 1978) .19

Tex. Mut. Ins. Co. v. Snap-on Bus. Solutions, Inc., No. H-09-2780, 2011 U.S. Dist. LEXIS 9042, *7-8 (S.D. Tex. Jan. 31, 2011)........................................................36

Toon v. Wackenhut Corrections Corp., 250 F.3d 950, 952 (5th Cir. 2001)............53

Tucker v. CBE Group, Inc., 710 F. Supp. 2d 1301, 1307 (M.D. Fla. 2010) ...........54

Turpin v. Merrell Dow Pharm., Inc., 959 F.2d 1349, 1360 (6th Cir. 1992)............43

United States v. Kington, 875 F.2d 1091, 1102 (5th Cir. 1989)..............................30

Universal Motors, Inc. v. Waldock, 719 P.2d. 254, 259 (Alaska 1986)..................31

Viterbo v. Dow Chemical Co., 825 F.2d 420, 421-22 (5th Cir. 1987)....................42

Volkswagen v. Ramirez, 159 S.W.3d 897, 911-12 (Tex. 2004) ..............................44

Wal-Mart Stores, Inc. v. Merrell, 313 S.W.3d 837, 840 (Tex. 2010) ............. 36, 44

**STATUTES**

15 United States Code § 2301 ................................................................................4

15 United States Code § 2310 .................................................................. 1, 15, 38

28 U.S.C. § 1927 ................................................................... 2, 14, 51, 52

28 United States Code § 1291 .............................................................................1

Texas Business & Commerce Code § 2.714 .................................................. 18, 19

Texas Business & Commerce Code § 2.715 .................................................. 18, 19

**RULES**

Federal Rule of Appellate Procedure 34 ................................................................ iv

Federal Rule of Civil Procedure 36 ......................................................................33

Federal Rule of Evidence 702 ..........................................................................3, 58

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction of this matter under 15 U.S.C. § 2310(d)(3)(B), as the amount in controversy is at least $50,000. Appellant April Scarlott ("Scarlott") requested damages in the amount of "$50,000.00 or less," ROA.88;¶1, and her discovery responses and sworn deposition testimony (made prior to Removal) confirm she seeks recovery of the subject vehicle's purchase price plus incidental and consequential damages, totaling more than $50,000.00. The District Court issued a final judgment on August 28, 2013.

Appellants filed their Notice of Appeal and Supplemental Notice of Appeal on November 7, 2013. Appellants filed their brief on January 24, 2014.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

### STATEMENT OF ISSUES

Response to Issue 1, which argues the District Court erred in refusing to grant Scarlott's motion to remand:  according to Scarlott's pleadings and discovery responses, the amount in controversy was at least $50,000.00 at the time the case was removed.

Response to Issue 2, which argues the District Court erred in granting NNA summary judgment on Scarlott's claims:  the District Court did not solely grant summary judgment on NNA's affirmative defense.  Scarlott had no evidence to support any of her causes of action against NNA and NNA negated at least one element on each of Scarlott's causes of action.

Response to Issue 3, which argues the discovery rule applies to Scarlott's claims against Hurricane Auto Care & Accessories, Inc. ("Hurricane"):  as this issue does not pertain to NNA, NNA will not respond.

Response to Issue 4, which argues the District Court erred in awarding NNA costs and fees under 28 U.S.C. § 1927 in the court's inherent power:  the record amply shows Weisberg & Meyers, LLC and Noah Radbil unreasonably and vexatiously multiplied the proceedings.  An award of costs and fees was

appropriate. The amount awarded was substantially less than the amount Plaintiff caused NNA to incur.

Response to Issue 5, which argues the District Court erred in awarding Hurricane costs and fees against Weisberg & Meyers, LLC and Noah Radbil: As this issue does not pertain to NNA, NNA will not respond.

Response to Issue 6, which argues neither NNA nor Hurricane submitted sufficient evidence of attorneys' fees: NNA's counsel brought extensive billing records to the hearing on NNA's Motion for Sanctions, which included a description of each increment of time, as well as the total hours billed.

Response to Issue 7, which argues the District Court erred in striking Scarlott's expert, Stephen Weaver: Weaver's opinions are untested, unreliable, unsupported by objective facts or data, and contrary to Texas legal authority on defect. These opinions do not meet the reliability standard in Federal Rule of Evidence 702, and were accordingly excluded.

## STATEMENT OF THE CASE

Appellee Nissan North America, Inc. disagrees with Appellants' statement of the procedural history of the case.

*Nature of the case*.   Appellant April Scarlott ("Scarlott") filed suit against NNA, contending NNA breached its warranty related to the performance of a 2006 Nissan Murano (VIN JN8AZ08T36W410083) ("subject vehicle" or "Murano"). ROA.244.  ROA.250-252.   Scarlott asserted claims against NNA for breach of express warranty and breach of the implied warranty of merchantability under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, et seq.  ROA.239. ROA.250-255.  ROA.261-263.

*Course of relevant proceedings*.   Scarlott originally filed suit in state court against NNA on October 19, 2009.   ROA.22.   Nissan Motor Acceptance Corporation ("NMAC") properly removed this case to federal court on December 6, 2010.  ROA.22-25.  After actively pursuing her case in federal court for over two years, Scarlott filed a motion for remand on May 9, 2013.   ROA.5191. ROA.2824-2854.

*Trial court disposition*.   The District Court granted NNA's Motion for Summary Judgment and entered a Final Judgment in this case on August 28, 2013. ROA.2960-2966.  On October 10, 2013 the District Court entered an Order on Attorneys' Fees and Costs, granting NNA $180,000 in attorneys' fees and costs to

be paid jointly and severally by Noah Radbil and Weisberg & Meyers, LLC. ROA.4937.

*Relevant Facts*. Appellants misstate the facts in their brief.

### A. *Scarlott Purchased the Murano and Chose to Install An Aftermarket Homelink Mirror.*

Scarlott purchased the subject vehicle on December 26, 2006 from Clear Lake Nissan ("Clear Lake"), ROA.1447;17-18, an independently owned and operated dealership. ROA.753;1-5. ROA.1444;17-23. Scarlott negotiated the purchase price with Clear Lake, and ultimately contracted with Clear Lake for the Murano's purchase. ROA.1469-1499. Scarlott purchased a Murano S, a trim level not equipped with a Nissan HomeLink Universal Transceiver as standard equipment.

The day after her purchase, Scarlott returned to Clear Lake with the Murano, requesting an aftermarket rearview mirror equipped with a HomeLink system. ROA.800;1-15. ROA.801;18-802;19. Clear Lake agreed to pay Hurricane to install the accessory. ROA.1447;15-1449;21. NNA did not facilitate, install, warrant, or approve of this aftermarket rearview mirror or its installation by third party vendor, Hurricane, and knew nothing of this modification until after Scarlott filed suit. ROA.1448;3-22. ROA.1449;5-8.

Scarlott knew the Murano was modified because Scarlott actually chose the aftermarket mirror Hurricane installed and took the Murano to Hurricane for the installation. ROA.1499;22-24. ROA.1500;11-18.

**B.     *The Aftermarket Mirror Caused the Electrical Problems.***

On September 4, 2007, the Murano began to experience electrical problems, including difficulty starting. ROA.782. Thinking the cause was a bad battery, Clear Lake replaced the battery. ROA.1469-1470. ROA.1479-80. The Murano continued to experience intermittent electrical problems for the next two years, despite four battery replacements. ROA.1469-1470. ROA.1479-80. ROA.1485-1487. ROA.1489-1490. ROA.1492-1493. The Body Control Module (BCM) was also replaced, and yet the electrical problem returned. ROA.1469-1470. ROA.1489-1490. ROA.1492-1493.

In November 2009, Clear Lake technicians monitored the car for almost thirty days. ROA.1451;9-1452;3. They finally discovered an intermittent electrical draw. ROA.1452;6-23. They traced the circuits until they found the draw originated at the aftermarket HomeLink mirror. ROA.1453;18-23. ROA.1454;16-24. ROA.1469-1470. ROA.1494-1495. Clear Lake took the Murano to Hurricane for repair since the HomeLink mirror was not a Nissan product and Hurricane warranted the mirror and its installation. ROA.1455;22-24. ROA.1456;24-25.

The owner of Hurricane, Srinivasa "Sam" Gogineni, reviewed the installation instructions for the particular mirror installed, a GEN-K51 model manufactured by Mito Corporation. ROA.1528;10-1529;12. The instructions explicitly warn if the mirror is improperly wired, it could drain the vehicle's battery. ROA.1536. ROA.1540.

> **NOTE:  If mirror remains on at all times, it could eventually drain the car's battery.**

Hurricane subsequently found the mirror did remain on and thus, was draining the battery. ROA.1525;15-22. Hurricane swapped the "constant" and "ignition" wires on the mirror to ensure when the vehicle was turned off, the mirror would also be off.

> **Q:** So you did actually make a repair. **You changed the terminals of the connection?**
>
> **A:** **Yes, because one is ignition and the other one is a constant.**
>
> Q: And by changing the terminals of the connection, now the mirror would turn off when the vehicle was turned off?
>
> A: Yes.
>
> Q: **Because before when the vehicle was brought in to you, the mirror would stay on constantly?**
>
> A: **Yes.** And that's when we see in the instructions, and we fixed it. That's what we have come to know.
>
> Q: So you fixed it by changing the terminals?
>
> A: Yes.

ROA.1532, 17-1533, 6.

Thus, Hurricane acknowledged the problem and re-wired the mirror to comply with the manufacturer's instructions. ROA.1532;10-1533;6. ROA.1536-1544. Hurricane made this repair under its warranty, ROA.1533;15-1534;3, and Scarlott was advised the mirror caused the electrical drain. ROA.1458;6-8. ROA.1469-1470. ROA.1494. ROA.1514;1-19.

The Murano subsequently experienced no other electrical problems. ROA.805;3-806;9. ROA.1457;1-3. Even Scarlott's designated expert, Stephen Weaver, readily admitted the vehicle "no longer has any existing defects." ROA.913. Scarlott's counsel judicially admitted same.

> Mr. Radbil:  The last time she took it to be repaired was, I believe, shortly after the wiring was fixed or replaced with the mirror.  But it has been sometime since she has been.

ROA.5086;24-5087;2.

## C.    *Scarlott's Allegations of Continued Electrical Problems Are Unsubstantiated.*

In March 2012, Scarlott executed an affidavit claiming the Murano experienced continued electrical problems in February and March 2012, attempting to defeat NNA's motion for summary judgment. "[T]he Murano failed to start on at least five occasions after [Clear Lake] returned it to Scarlott 'with no draw on the electrical system.'"  *See* Appellants' Brief, at p. 9. These "occasions" were,

however, more than twenty-six months after Hurricane repaired the Homelink mirror, and after the Murano's limited warranty expired.  ROA.2757-2759.  These "occasions" all occurred within a six-day period and Scarlott did not drive the vehicle for two days during that time.  *Id*.  Scarlott then purchased a new battery and the problems have apparently not recurred.  ROA.2759.[1]  Scarlott and her counsel nonetheless represent to this Court that the Murano has "repeatedly" failed to start after Hurricane re-installed the Homelink mirror.[2]

### D.     The Murano's BCM Did Not Cause the Murano's Electrical Problems.

Scarlott claims the BCM (body control module) caused the Murano's electrical problems.  *See* Appellants' Brief, at p. 12, 14-15.  She takes testimony from three witnesses, Bob Gore, Neal Barnes, and Ryan Schooley, out of context to create this scenario, quoting summaries from the repair orders.  ROA.2222-2223.  Contrary to Scarlott's assertions, no person has ever testified the Murano's original BCM was not powering down and was causing the battery to drain.  The

---

[1] NNA warrants only an original equipment battery, and will replace the battery without charge if it becomes unserviceable within the first 24-months of service.  ROA.1546-1547. ROA.1557-1559.

[2] Scarlott's allegations of continued electrical problems were asserted for the first time in her self-serving, inadmissible affidavit, which Scarlott moved the District Court to accept as supplemental evidence in opposition to NNA's First Amended Motion for Summary Judgment. ROA.2750-2774.  NNA objected to the admission of this Affidavit.  ROA.2775-2809.  After reviewing NNA's Response to Scarlott's Motion for Leave, the trial court denied Scarlott's motion, and such order is not part of this appeal.  ROA.2822.

original BCM was never tested, and there is no objective evidence it ever contributed to cause the Murano's electrical problems.  ROA.2655;¶5.

Even so, Clear Lake did replace the Murano's BCM.  ROA.2302-2304.  The replacement did not resolve the Murano's electrical problems.  ROA.2543-2544. ROA.2563-2564.    ROA.2566-2568.    Instead, the problems continued until Hurricane re-wired the aftermarket Homelink mirror.  ROA.2591;9-20.

### E.     NNA Provided a New Vehicle Limited Warranty.

NNA provided a limited warranty related to the Murano.  NNA's New Vehicle Limited Warranty ("Limited Warranty") explicitly states non-Nissan accessories are not covered.  This Limited Warranty covers "any repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan except for the exclusions or items listed under the caption 'WHAT IS NOT COVERED.'"  ROA.813-814.  ROA.824-826. As with all vehicle manufacturers, NNA does not warrant components outside of its distribution, or the installation of aftermarket, non-Nissan accessories. ROA.813-814.  ROA.826.  Nor does NNA warrant improper installation of Nissan-approved accessories or components.  *Id.*  These exclusions are clearly defined in the Murano's 2006 New Vehicle Limited Warranty:

**WHAT IS NOT COVERED**
**DAMAGE, FAILURES OR CORROSION DUE TO ACCIDENTS, MISUSE OR ALTERATIONS**

This warranty does not cover damage, failures or corrosion resulting from:

- Accident, theft, fire, driving through water (including engine water ingestion) or misuse (Proper use is outlined in your OWNER'S MANUAL).

- **Alteration, tampering or improper repair**.

- **Installation of non-Nissan approved accessories or components**.

- **Improper installation of any Nissan approved or aftermarket accessory or component**.

*Id.*

NNA had no knowledge this mirror was installed in the subject Murano, did not participate in choosing the mirror, did not install the mirror, repair the mirror, or warrant the mirror. ROA.751;3-22. ROA.752;5-8. Accordingly, the repairs at issue were not covered by the Limited Warranty and Scarlott's breach of warranty claims against NNA fail as a matter of law.

**F.    *Scarlott and her Attorneys Needlessly Continued this Litigation and Misrepresented the Facts to the Trial Court.***

Scarlott originally filed suit in state court against NNA on October 19, 2009, asserting causes of action for breach of express and implied warranties under the Magnuson-Moss Warranty Act and Texas Deceptive Trade Practices Act ("DTPA"). ROA.35-45. Contrary to Scarlott's insinuation, Plaintiff's Original

Petition and amendments thereto specifically pled monetary recovery of $50,000 or less. ROA.35-45. ROA.88-114. ROA.239-265.

After filing suit but before NNA ever filed an Answer, Scarlott was given the repair order from Clear Lake, indicating the rearview mirror caused the electrical drain. ROA.1469-1470. ROA.1494. Scarlott personally spoke to Clear Lake's service manager, Bob Gore, who again confirmed the aftermarket mirror Hurricane installed caused the Murano's electrical problems. ROA.804. ROA.1514. Scarlott knew the mirror was an aftermarket part, as she herself picked it out and took the vehicle to Hurricane Glass for its installation. ROA.1499;22-24. ROA.1500;11-18. Further, Scarlott had NNA's New Vehicle Limited Warranty, which explicitly states non-Nissan accessories are not warranted. ROA.813-814. ROA.824-826. She even had sworn deposition testimony from Hurricane admitting it incorrectly installed the mirror, which was draining the battery. ROA.1532;10-1533;6. Despite the overwhelming evidence proving the Murano was not defective in materials or workmanship, Scarlott and her counsel continued to prosecute this litigation against NNA for the next four years.

## SUMMARY OF THE ARGUMENT

This case was properly removed to federal court and the federal district court had subject matter jurisdiction over Scarlott's claims. Scarlott brought suit for breach of warranty under the MMWA, specifically alleging damages in the amount of $50,000.00 or less. This pleading, along with Scarlott's discovery responses and sworn deposition testimony (made prior to Removal), confirm she seeks recovery of the Murano's purchase price plus incidental and consequential damages, totaling more than $50,000.00. State law determines the applicable measure of damages, and thus, the District Court correctly considered Scarlott's request for incidental and consequential damages.

The District Court appropriately granted NNA summary judgment on Scarlott's breach of warranty claims. Scarlott's claims were not supported by facts or law, and NNA conclusively proved the Murano's ongoing electrical problems were caused by Hurricane's improper installation of a non-Nissan accessory, an aftermarket Homelink mirror. Scarlott attempted to defeat summary judgment by creating confusion and hypothetical situations in which the BCM in other vehicles resulted in electrical issues. In this matter, however, Scarlott presented no evidence the Murano's BCM caused the electrical problems. In fact, the Murano's BCM was nonetheless replaced and yet the problems continued. Further, Scarlott's

"expert" witness' testimony was no evidence of defect, as his opinions were properly excluded as unreliable and thus, inadmissible.

Finally, costs and fees were appropriately awarded under 28 U.S.C. § 1927 and the District Court's inherent power given Weisberg & Meyers' needless and vexatious continuation of this litigation. NNA provided detailed billing records to the District Court that included a description of the work performed during each increment of time, as well as the total hours billed. Scarlott's counsel admitted to the District Court he probably billed more time than NNA's counsel and felt NNA's fees were not unusual. ROA.5251;9-16. The District Court awarded nearly $35,000 less than the total fees and costs of which NNA submitted evidence. ROA.5252. ROA.5256.

**ARGUMENT**

**Issue 1:**    **The District Court Properly Denied Scarlott's Motion for Remand.**

The MMWA provides a claim under the Act is not "cognizable" in federal court "if the amount in controversy *is less than* the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit."  15 U.S.C. § 2310(d)(3)(B) (emphasis added).  In other words, a federal court has subject matter jurisdiction if the amount in controversy is $50,000 or more.  15 U.S.C. § 2310(d)(3)(B).

Thirty months after this case was removed, Scarlott filed a Motion to Remand, claiming the District Court lacked subject matter jurisdiction because she did not seek recovery of $50,000 or more in damages.  ROA.2824-2854.  Contrary to Scarlott's argument and for the reasons set forth below, Scarlott has affirmatively pleaded facts supporting the amount in controversy requirement.

### A.    *Jurisdiction Must be Assessed at the Time of Removal.*

It is well-established "[t]he jurisdictional facts that support removal must be judged at the time of the removal . . . ."  *Allen v. R & H Oil and Gas Co.*, 63 F.3d 1326, 1335 (5th Cir. 1995).

> The amount stated in the complaint is itself *dispositive* of jurisdiction, unless it appears or is in some way shown that the amount stated is not claimed in good faith.  For these purposes, good faith is deemed to be lacking only

> when it appears to a legal certainty that the claim is really
> for less than the jurisdictional amount.

*Dassinger v. South Central Bell Telephone Co.*, 505 F.2d 672, 673-74 (5th Cir. 1974) (emphasis added).   More specifically, "[i]n order for a court to refuse jurisdiction it must appear to a legal certainty that the claim is really for less than the jurisdictional amount."  *Allen*, 63 F.3d at 1335.

### B.     Plaintiff's Complaint Confers Jurisdiction.

The court must look to the "plaintiff's well-pleaded complaint" to see if it raises a federal question in order to determine if a case is properly in a federal forum.  *Howery v. Allstate Ins. Co.,* 243 F.3d 912, 916 (5th Cir. 2001).   The presence or absence of federal question jurisdiction is governed by the "well-pleaded complaint rule," which provides federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pled complaint. *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392 (1987).

At the time of removal, Scarlott's First Amended Petition affirmatively pleaded allegations dispositive of jurisdiction.   She claimed not less than five vehicle systems were defective, including but not limited to, the vehicle's engine control system, front suspension, engine electrical system, supplemental restraint system, and interior fit and finish.   ROA.96-97;¶39.   Scarlott also alleged the vehicle had been subject to "numerous failed repair attempts" and "as a result of the ineffective repair attempts . . . the [vehicle] cannot be utilized as intended . . .

and that the use and value of the [vehicle] has been diminished and/or substantially impaired to [Scarlott]." ROA.90. ROA.98.

As for damages, Scarlott prayed for the recovery of $50,000.00:

> The plaintiff intends that discovery in this case shall be conducted under Level One as set forth in Tex. R. Civ. P. Rule 190.1 because this suit involves only monetary relief totaling $50,000 or less, excluding court costs, prejudgment interest and attorney fees.

ROA.88, ¶ 1 (emphasis added).

This $50,000 in requested damages comprised of the subject vehicle's retail sales contract, which totaled $39,289, as well as additional damages allegedly incurred as the case progressed. ROA.93. ROA.98. "Consumer has been and will continue to be financially damaged due to Warrantors' conduct as described herein." ROA.98;¶46. Scarlott also demanded "un-liquidated damages within the jurisdictional limits of this court in the form of diminished value, incidental and consequential damages, including loss of use and aggravation and convenience. . ." as a result of NNA's alleged breach of express and implied warranties brought under the MMWA. ROA.100-101;¶56;¶61. *See also* ROA.2870-72, Memorandum Opinion in *Standish v. Nissan N. Am., Inc.,* wherein the trial court specifically found plaintiff's petition invoked federal jurisdiction when plaintiff alleged "monetary relief totaling $50,000 or less.").

Scarlott claims her amended petition includes "an unequivocal statement showing that she sought no more than $39,500.00, excluding attorneys' fees and

costs." *See* Appellants' Brief, at p. 27. Scarlott is actually referring to her DTPA demand letter sent *prior* to suit. ROA.98;¶44. This notice letter is not referenced in the amended petition's prayer for relief. ROA.113. Instead, it is mentioned only a singular time in which she maintains she has met all preconditions necessary to file suit. ROA.98;¶44-¶46.

Moreover, a brief review of the notice letter demonstrates this is not the amount of damages Scarlott would seek if she ultimately filed suit. The notice letter expressly avers she would seek "all actual and exemplary damages available." ROA.334-336.

Scarlott's pre-suit demand does not, therefore, alter the Court's consideration of the amended petition and the damages asserted therein.

### C.    *Texas State Law determines the Proper Measure of Damages.*

"[R]esort to state law is proper to determine applicable measure of damages under Magnuson-Moss Warranty Act." *MacKenzie v. Chrysler Corp.*, 607 F.2d 1162, 1166 (5th Cir. 1979). Under Texas law, direct damages in a breach of warranty action are measured by the difference between the value of the goods accepted and the value of the goods if they had been as warranted. TEX. BUS. & COM. CODE § 2.714. Texas law also provides for the recovery of incidental and consequential damages in a breach of warranty action. *See id.* at §§ 2.714, 2.715. Incidental damages include reasonable expenses incident to the alleged breach. *Id.*

at § 2.715. Consequential damages include any loss resulting from general or particular requirements that the seller, at the time of contracting, had reason to know about and that could not reasonably prevented by cover, or otherwise, and any injury to person or property proximately resulting from the breach. *Id.* at §§ 2.714, 2.715.[3] While NNA maintains the Limited Warranty properly disclaims incidental and consequential damages, Scarlott disputes such limitations in her Petition, and has therefore put them in issue. ROA.100-101;¶56;¶61.

### D. Damages under the MMWA are not Limited to the Vehicle's Purchase Price.

The crux of Scarlott's argument is the assertion that her "recovery under the MMWA is limited to the value of the vehicle at issue." *See* Appellants' Brief, at p. 22-23. Scarlott cites to *Boelens v. Redman Homes*, 748 F.2d 1058 (5th Cir. 1984). The *Boelens* court held "[d]amages for economic loss are clearly recoverable under the MMWA, and those damages may be used to satisfy the amount-in-controversy requirement." *Id.* at 1069. In determining whether the amount in controversy requirement was met, the court could only review the economic damages claimed, *i.e.*, lost investment in the mobile home and additional costs of alternative housing. *Id*. at 1071. The *Boelens* plaintiffs did <u>not</u> allege any other economic damages, and therefore, the amount in controversy was not met.

---

[3] Incidental and consequential damages may include foreseeable lost profits. *See id.* at § 2.715(b); *Garcia v. Texas Instruments*, 610 S.W.2d 456, 462 (Tex. 1980); *Signal Oil & Gas Co. v. Universal Oil Prods.,* 572 S.W.2d 320, 326 (Tex. 1978).

In the present case, however, NNA requests the Court review the economic damages Scarlott seeks, including the value of the vehicle's sales contract, alleged loss of use, and other alleged consequential and incidental damages.

### E.     *Scarlott's Testimony and Discovery Responses Confirm she Seeks Consequential and Incidental Damages.*

Even if the Court determines there are ambiguities in Plaintiff's First Amended Petition, the Court need only review Scarlott's deposition testimony and discovery responses detailing her alleged damages.   Three months prior to Removal, Scarlott served discovery responses, stating she is entitled to the following damages:

> a. Expectation damages (i.e. diminution in value), which Scarlott defines as the difference between the vehicle's value as warranted and the vehicle's value as delivered.  "Mathematical certainty as to amount of [diminution in value] damages is not required because mathematical certainty as to the amount of damages is not possible."

> b. "Aggravation and inconvenience damages due to (i) the necessity of continually having to bring the vehicle in for repairs . . . (ii) the persistence of the problems . . . which rendered the vehicle difficult, unpleasant, frightening, and/or extremely annoying [and] aggravating to operate, and (iii) the interruptions to [Scarlott's] ordinary schedule of activities and routines due to the vehicle's repeated malfunctioning."

> c. "The loss of use of the vehicle when it was in the repair shop (and even when it was not in the repair shop since [Scarlott] was forced to refrain from making ordinary use of the vehicle due to the defects, non-conformities and/or conditions that plagued it . . .)."

          d. Consequential and incidental damages, including "purchase of a service contract that fails to add to the warranty."

ROA.2881-2884.

Scarlott produced some documentation of her alleged damages, including the vehicle sales contract of $39,289,[4] charges of $225.00 for a wrecker service, rental car receipts totaling approximately $1,600, $1,700 in repairs, and a quote of $400 for installing a Homelink mirror.  ROA.2898.  ROA.2905-2919.  She also testified she spent an additional $120 to purchase a battery charger she used every night to charge the vehicle's battery, and her electricity bills subsequently spiked due to her increased electrical use from the battery charger.  ROA.2926;12-20.  ROA.2926;3-11.

In addition, Scarlott is a real estate broker.  ROA.2923;17-23.  As part of her alleged consequential and incidental damages, Scarlott contends the loss of use of her vehicle caused her lost sales relating to her employment.  ROA.2927;19-2928;15.  She values each lost sale's commission between $6,000.00 and $10,000.00.  ROA.2928;22-2929;12.

Scarlott's discovery responses and sworn testimony conclusively prove she seeks recovery of incidental and consequential damages, totaling *more* than the total sum of $50,000.00.

---

[4] Scarlott contends the Murano was worthless as it was allegedly inoperable. ROA.2890;19-24.

### F.    *Scarlott's Cited Case Law Does Not Support Remand.*

Scarlott cites to non-binding opinions of courts in other Circuits, including *Samuel-Bassett v. Kia Motors America, Inc.*, 357 F.3d 392 (3rd Cir. 2004), and *Gardynski-Leschuck v. Ford Motor Co.*, 142 F.3d 955 (7th Cir. 1998), for the proposition that vehicle purchase price, standing alone, conclusively establishes the amount in controversy in this case.[5] Not only are these cases factually distinguishable from the present matter, but a closer examination shows the courts considered more than just vehicle purchase price.

In *Samuel-Bassett,* the court acknowledged Pennsylvania law allows for incidental and consequential damages in a breach of warranty action. However, the court noted adding those damages to a conjectural estimate of the value of an allegedly defective vehicle with a base purchase price of $13,370 failed to meet the jurisdictional threshold for damages. *Samuel-Bassett*, 357 F.3d at 402-03.

Likewise, the court in *Gardynski-Leschuck* acknowledged consequential and incidental damages are recoverable in a breach of warranty case under Illinois state law, but noted the plaintiff was not entitled to such damages in *that* case. *See Gardynski-Leschuck*, 142 F.3d at 957-58. Ultimately, it ruled the plaintiff could

---

[5] *Samuel-Bassett v. Kia Motors America, Inc.* and *Gardynski-Leschuck v. Ford Motor Co.*, involve the state laws of Pennsylvania and Illinois, respectively. Scarlott has made no showing whether Pennsylvania and Illinois state law on breach of warranty allows the same recovery as that of Texas.

not establish federal jurisdiction under the MMWA where the purchase price of her vehicle was only $18,500. *Id.* at 956, 959.

Neither *Samuel-Bassett* nor *Gardynski-Leschuck* stand for the principle that a federal court does not have jurisdiction under the MMWA where, as here, the vehicle's purchase price is almost $40,000 and Scarlott has alleged extensive and substantial incidental and consequential damages.

### G. The Discovery Control Plan is the Beginning, not the End of the Jurisdictional Analysis.

Scarlott cites to *Lewis v. Mercedes-Benz USA*) for the proposition that the discovery level a plaintiff pleads "is insufficient to constitute *unequivocal evidence* that the amount in controversy exceeds the jurisdictional amount." No. V-11-16, 2011 WL 2442659, *1 (S.D. Tex. June 14, 2011) (emphasis added). In *Lewis*, the plaintiff merely stated discovery was to be controlled under Level 2 Discovery Control Plan, without specifying any amount of monetary damages. ROA.2936-2944. The court found plaintiff's election of a Level 2 Discovery Plan "does not necessarily imply that its damages are actually equal to or greater than $50,000." *Lewis*, 2011 WL 2442659 at *2. The court then analyzed whether the amount in controversy was likely equal to or greater than $50,000. *Id*. The court recognized the vehicle's purchase price totaled $39,705.51. *Id*. But that ended the court's examination since the defendant "failed to set forth any facts to support . . . additional damages for 'collateral charges; [ ] finance charges; [ ] incidental

damages; and [ ] consequential damages . . . amount[ing] to more than $10,000."
*Id*. at *3.

Here, Scarlott's First Amended Petition alleged $50,000.00 in damages, and did not merely plead a Level 2 Discovery Control Plan.  Additionally, NNA has brought forth evidence of "additional damages" Scarlott seeks.

For these reasons, the Court has subject matter jurisdiction.

**Issue 2:      The District Court Properly Granted NNA's Motion for Summary Judgment.**

In her second issue, Scarlott claims the District Court granted NNA's Motion for Summary Judgment "not because it found a necessary element of Scarlott's claim for breach of express warranty lacking, but because it found- as a matter of absolute fact- that the cause of the Murano's electrical problems was something other than defective NNA components."  *See* Appellants' Brief, at p. 36.

In fact, the District Court found: (1) Scarlott's claims against NNA are not supported by facts or law, and (2) NNA "exhaustively showed" the Murano's electrical problems were caused by Hurricane's installation of the aftermarket mirror.  ROA.2962-2965.  Scarlott had no evidence to support any of her causes of action against NNA and NNA negated at least one element on each of her claims. The District Court appropriately granted NNA summary judgment.

**A.    *The Mere Fact the Subject Murano has been Repaired is Insufficient to Prove Breach of Warranty or Product Defect.***

Texas courts have held the mere existence of a product failure does not alone establish a fact issue of product defect.  *See Rodriguez v. Ed Hicks Imports*, 767 S.W.2d 187 (Tex. App.—Corpus Christi 1989, no writ) (holding the mere fact an automobile overheats, ejecting water from its radiator, was insufficient proof the radiator or its cap was defective); *Kroger Co. v. Betancourt*, 996 S.W.2d 353, 358 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (concluding the straddle stacker, used to stack groceries, was not defective merely because an accident occurred).

Scarlott attempts to confuse the issue by referencing all repairs made under warranty as "electrical" repairs: "NNA reimbursed CLN for repairs it made to the Murano's batteries, BCM, dome lights, air bag light, and rear wipers—each of which CLN characterized as an 'electrical' repair."  *See* Appellants' Brief, at p. 51. Many of these repairs did not relate to the electrical issue that is the basis of this lawsuit.   Instead, they were **<u>singular</u>** incidents of repair during the four years Scarlott owned the Murano.

### 1.    <u>Scarlott's Airbag Complaint Could Not be Duplicated.</u>

Scarlott complained the Murano's airbag system was defective.  The Murano was brought to an authorized Nissan dealer on one occasion for complaints related

to the airbag, but the problem could not be duplicated and thus, no repair was needed. ROA.1460;9-20.

### 2.     A Single Repair to the Dome Light.

The Murano's dome light was repaired on a singular occasion. Technicians replaced a fuse in the light, and made no other repairs. ROA.1469-1470. ROA.1479-1480.

### 3.     The Rear Wipers were Adjusted.

Scarlott complained the wiper was loose and technicians re-installed it. ROA.1469-1470. ROA.1474-1475. None of the above repairs were "electrical repairs."

### B.     *Scarlott Has No Evidence The BCM Caused the Murano's Electrical Problems.*

Scarlott argues the BCM "could very well have caused the Murano's electrical problems." *See* Appellants' Brief, at p. 39. Scarlott then describes the testimony of "NNA's three witnesses," distorting and mischaracterizing the testimony given.

NNA presented affidavit testimony from Bob Gore, Clear Lake's Service Manager, who *replaced* the Murano's BCM. Mr. Gore explained Clear Lake replaced the BCM "with the hopes of repairing the subject Murano's recurring and intermittent electrical problems. . . as other avenues of repair had not been successful." ROA.2654-2655. This is consistent with Mr. Gore's deposition

testimony, providing "So I put a BCM as per Nissan, you know; and this was through a suggestion, *not really so much working on this particular car*." ROA.2538; 6-8.  But replacing the BCM did *not* resolve the Murano's electrical problems.  Scarlott returned days later with the same complaints.  ROA.2543-44; ROA.2563-2564.  ROA.2566-2567.  The electrical problems were not resolved until Hurricane correctly installed the Homelink mirror.  ROA.1457;1-3.

In addition, NNA's witnesses, Mr. Barnes and Mr. Schooley, provided testimony related to hypothetical questions – if a BCM is not powering down, it can, *hypothetically,* cause a battery to drain.  ROA.1754-1755.  ROA.1757-1758. The answer was yes; however, no person in this litigation has ever testified the Murano's original BCM was not powering down and was actually causing the Murano's battery to drain.  The original BCM was never tested and there is no evidence the BCM ever contributed to cause the electrical problems. ROA.2655;¶5.  In fact, Scarlott's counsel recognized as much in their judicial admission to the District Court:

> The Court:  My fact is she makes a complaint and it's fixed.  She has no complaint if they fix it.  In this case, she made a complaint.  They replaced the BCM.  It didn't fix the complaint, but she has no complaint about the BCM.
>
> Mr. Radbil:  Specifically about the BCM, no, I would agree.

The Court: Okay. So, whether it was defective or not is irrelevant. It was replaced and it was not, apparently causing the harm. The harm continued.

Mr. Radbil: Sure.

ROA.5121;19-5122;3.

### C. *Scarlott Fails to Address the Faulty Installation of the Homelink Mirror as a Cause of the Murano's Electrical Problems.*

Scarlott lists the elements necessary to recover under MMWA. The first element presented is "the existence of a defect in the automobile *covered by the warranty*." *See* Appellants' Brief, at p. 31 (emphasis added). Scarlott does not seem to contest that NNA provided a limited warranty for "any repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan . . . .'" ROA.813-814. ROA.824-826. Scarlott does not contest that NNA does not warrant non-Nissan approved accessories or components. *Id.* Scarlott also does not appear to contest that the aftermarket Homelink mirror is a non-Nissan approved accessory.

Faced with those facts, Scarlott devotes roughly thirteen pages of briefing in arguing the trial court improperly granted NNA summary judgment. She argues NNA was given a reasonable opportunity to repair the vehicle, but failed to do so. *See* Appellants' Brief, at p. 33. She argues she complied with the terms of NNA's warranty, and suggests the electrical problems were caused by the BCM. Missing

from her briefing, however, is any mention of the faulty installation of the aftermarket Homelink mirror.

Hurricane *confessed under oath* the aftermarket Homelink mirror caused the Murano's electrical problems. When Hurricane originally installed the accessory in the Murano shortly after Scarlott's purchase, it reversed two wires, causing the mirror to drain the vehicle's battery.

> Q:     So how did you check it?
>
> A:     So I checked it by going through these instructions on the -- **checking this note saying that if it got the -- the power on, the mirror was on all the time, then it could drain the battery. Then we checked the mirror, the -- what you call the display mirror.** *So it was on. So we thought that's probably draining the battery. . . .*

ROA.1528;15-22. To repair this issue, Hurricane reversed the "constant" and "ignition" wires. ROA.1531;13-1532;4. ROA.1532;10-1533;6.

The question arises as to why Scarlott never addressed Hurricane's testimony in Appellants' Brief. The answer is clear: Scarlott is in a "catch-22." Scarlott argues she has a cause of action against Hurricane and Hurricane should not have been dismissed pursuant to limitations. *See* Appellants' Brief, at 44-46. And yet, the only claim Scarlott could have against Hurricane relates to negligently installing the aftermarket mirror, which would thus conclusively negate Scarlott's causes of action against NNA.

Scarlott has not proven the existence of a defect covered under NNA's warranty. She also has not contested Hurricane's admission of liability. It is no coincidence that after the mirror was correctly installed, the Murano experienced no other electrical problems. Accordingly, Scarlott's breach of warranty claim fails as a matter of law.

### D. Repairs Made to the Murano Are not Concessions of Defect.

Scarlott claims "[b]y covering CLN's repairs to correct the Murano's electrical problems under its warranty, NNA admitted the problems were caused by defects in its materials or workmanship." *See* Appellants' Brief, at p. 37-39. Scarlott's contentions are flatly incorrect, baseless, and made in bad-faith.[6]

Scarlott took her Murano to Clear Lake on multiple occasions for repair. These repairs varied from a single incident involving a cosmetic issue, such as a cup holder, to multiple visits related to the intermittent electrical issues. At all times, NNA met and exceeded its obligations by paying for claims that should not have been covered if NNA had known the battery was failing due to the improper installation of the aftermarket mirror. NNA consistently erred in favor of the consumer and in favor of honoring its warranty. Further, when NNA paid for these repairs, it did not even know the aftermarket mirror had been installed.

---

[6] Scarlott claims the warranty repairs are circumstantial evidence of defect. *See* Appellants' Brief, at p. 37. However, the District Court was presented with direct evidence of the cause of the Murano's electrical problems; namely Hurricane's confession of negligent installation of the mirror. *See United States v. Kington*, 875 F.2d 1091, 1102 (5th Cir. 1989) (stating direct evidence is better than circumstantial evidence).

Scarlott cites to a 28-year-old Alaskan state court case, *Universal Motors, Inc. v. Waldock*, 719 P.2d. 254, 259 (Alaska 1986), for the proposition that payment of a warranty claim is an admission of defect. *See* Appellants' Brief, at p. 37. In *Waldock,* the defendant dealership refused to repair the vehicle under warranty because it determined the car had been extensively damaged. *Id*. at 255. This court held when a consumer offers credible evidence of a defect in materials or workmanship, the burden then shifts to the warrantor to prove consumer abuse. *Id*. at 259. *Waldock* does not remotely hint that a warranty repair is an admission of a defect. *Id*. Further, Scarlott has not offered any credible evidence the Murano's electrical problem was a defect in materials or workmanship.

Scarlott also relies upon *Milicevic v. Fletcher Jones Imports, Ltd*., 402 F.3d 912 (9th Cir. 2005), for the proposition that payment of warranty claims is an admission of defect. *See* Appellants' Brief, at p. 38. No Texas state or federal court has relied on *Milicevic* for this proposition. Even so, *Milicevic* is distinguishable. In *Milicevic*, a defendant technician acknowledged the repairs at issue involved "factory defects" and were covered by the warranty. *Milicevic*, 402 F.3d at 919. This factual scenario is markedly different than the circumstances of the present case, where the repairs were a result of a third party vendor improperly installing an aftermarket, non-Nissan accessory. These repairs are clearly excluded under NNA's limited warranty. Plaintiff's reliance on *Milicevic* is misplaced.

Moreover, at least one court has expressly refused to follow the holding of *Milicevic*. In *Pizel v. Monaco Coach Corp.*, No. 3:04-CV-286, 2005 U.S. Dist. LEXIS 20079, *3 (N.D. Ind. Sept. 13, 2005), the plaintiff moved to exclude any evidence that repairs made under warranty were made for any reason other than to remedy a defect. The *Pizel* court determined the *Milicevic* holding was made without regard to any legal rule or authority.

> In addition, **this Court is not persuaded by Milicevic because the court did not cite to any legal authority supporting its conclusion that a repair under warranty is an admission of a defect.** Rather, this Court finds that it is the more prudent course to allow both parties to fully present their evidence and let the jury determine whether there was a defect.

*Id.* (emphasis added).

Scarlott claims NNA conceded the existence of defects in its products because its dealer tried to repair these problems and NNA reimbursed him for it. If NNA had refused to repair those problems, NNA would have been sued for failing to meet its warranty obligations. But now, because NNA paid for the warranty repairs, Scarlott argues such is an admission of wrongdoing and defect, and is being sued for failing to meet its warranty obligations. Scarlott's argument is deeply cynical, and is not supported by any binding legal authority.

### E.    Scarlott Admits She Has No Claim Against NNA.

Even before suit was filed, Scarlott believed the aftermarket mirror was causing the intermittent electrical drain.  She suggested to Clear Lake that the mirror may be draining the battery.  ROA.2587;18-2588;20.  Her suspicions were later confirmed.   Scarlott readily testified the aftermarket mirror caused the Murano to be inoperable.  "I think that the mirror was not installed correctly, and I also think that there were issues with the product itself. . . .  To my knowledge, the mirror created the problem that made the car inoperable."  ROA.259422-2596;6. *See also* ROA.2589;24-2591;15.

Scarlott not only testified she believed the aftermarket mirror caused the Murano's electrical issues, but her failure to timely respond to requests for admissions also served as admissions of fact.  Federal Rule of Civil Procedure 36 states: "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney . . ."  FED. R. CIV. P. 36(a)(3).

On November 3, 2010, NNA served Scarlott with its First Requests for Admission.  ROA.1611-1621.  Scarlott did not respond.  Thus, she has admitted every matter in each and every one of the eighty-seven requests.  Among other things, Scarlott admitted:

. . . The aftermarket rearview mirror was improperly installed by Hurricane Glass.

. . . Problems with the vehicle stalling were caused by the draining of the vehicle's battery.

. . . Problems with the vehicle failing to crank were caused by the draining of the vehicle's battery.

. . . Problems with the vehicle's electrical system were caused by the draining of the vehicle's battery.

. . . The battery was being drained because of improper installation of the aftermarket mirror by Hurricane Glass.

. . . The alleged non-conformities with the vehicle's electrical system were caused by improper installation of the aftermarket mirror.

. . . [T]he aftermarket mirror was not covered by NNA's express limited warranty.

. . . The subject Murano left NNA's possession with a factory rearview mirror.

ROA.1617-1618.  ROA.1621.

Thus, Scarlott admitted the Murano alleged non-conformities were attributable to the improperly installed aftermarket mirror and not any act or omission of NNA.  Accordingly, NNA is entitled to summary judgment on all of Plaintiff's claims against it.

### F.    *Scarlott Must Prove Causation and Not Merely a Malfunction.*

Scarlott claims she does not have a burden to show causation.  Instead, she must only demonstrate the Murano experienced a "malfunction."  *See* Appellants' Brief, at 41-42.  In that regard, Scarlott relies upon non-binding authority, *Larry J.*

*Soldinger Assocs., Ltd. v. Aston Martin Lagonda of N. Am., Inc.*, for the proposition that a claimant under the MMWA need not correctly identify the cause and source of all automotive defects.  No. 97-C-7792, 1999 U.S. Dist. LEXIS 14765, *17 (N.D. Ill. Sept. 13, 1999).  This is a blatant misstatement of the holding in *Soldinger*.  The portion of *Soldinger* Scarlott cites discusses how a car owner must report a vehicle problem to the dealership to give the dealership appropriate notice to repair the problem.  *Id*. at *16.  The court appropriately held notifying a dealership of a problem with the "driver's door" (rather than stating the specific problem was with the remote entry system) was sufficient.  *Id*. at *17.  *Soldinger* does not state a plaintiff need not identify the cause of an alleged defect after four years of litigation to avoid summary judgment.  Such frequent misuse of cited cases and habitual misrepresentation of facts reflects what NNA has been dealing with for over four years, and explains the trial court's holding of bad faith and vexatious litigation.

Scarlott also cites to a Florida state court case for the proposition that identifying the particular defective component is unnecessary under the MMWA. *Mason v. Porsche Cars of N. Am., Inc*., 688 So.2d 361, 367 (Fla. Dist. Ct. App. 1997).  However, the *Mason* plaintiff, who complained of a "shudder" in his vehicle, actually did identify the purported cause—"transmission clutches damaged by insufficient hydraulic pressure." *Id*.  Further, *Mason* is inapplicable when as

here, NNA has "exhaustively show[n]" the Murano's electrical problems were caused by Hurricane's installation of the aftermarket mirror. ROA.2962-65. No such modification was mentioned in the *Mason* opinion.

In Texas, a mere malfunction is not sufficient to carry a plaintiff's burden of proof. Texas requires a plaintiff to prove both general and specific causation. *See Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 840 (Tex. 2010) (holding evidence that halogen lamps can cause fire generally does not establish the lamp in question caused this fire); *Tex. Mut. Ins. Co. v. Snap-on Bus. Solutions, Inc.*, No. H-09-2780, 2011 U.S. Dist. LEXIS 9042, *7-8 (S.D. Tex. Jan. 31, 2011) (finding competent expert testimony and objective proof that a defect caused the injury is necessary).

### G.    *Scarlott has No Evidence NNA Breached Any Implied Warranty.*

To recover for breach of the implied warranty of merchantability, a plaintiff is required to show the defect rendering the product unfit for its ordinary purpose existed at the time the product left the defendant's possession. *See Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 (Tex. 1989). Here, Scarlott has no evidence the Murano, absent the aftermarket alteration, is unfit for its ordinary purpose. Nor is there evidence an alleged defect existed at the time the Murano left NNA's possession. Scarlott's counsel admitted as much to the trial court:

> Mr. Patterson (NNA's Counsel):  Your Honor.  This is
> Patterson.  I'm looking at the identification number and
> [the Murano] is made in Japan.
>
> The Court:  Thank you.  So the warranty covers not the
> mirror, and if I remember it, no the effect on
> manufactured-in-Japan stuff caused by aftermarket stuff,
> both the aftermarket stuff itself and any affect [sic] that
> stuff has on the car.
>
> Mr. Radbil:  Correct.
>
> The Court:  What does Weaver [Plaintiff's "expert"] say
> the defect in what came from Japan happened to be?
>
> Mr. Radbil:  *He doesn't know*.  He didn't pinpoint a
> specific cause.  He came up with possibilities.

ROA.5085;11-22 (emphasis added).

Scarlott's complaints focus on intermittent electrical problems, which were caused by an aftermarket part installed after the Murano left NNA's possession. ROA.1456, 10-21.  The Murano was not defective or non-conforming at the time it left NNA's possession, and Scarlott has no evidence to the contrary.  Accordingly, the District Court did not err in granting NNA's motion for summary judgment.

### H.    *Scarlott has No Evidence of Breach of Any Express Warranty.*

Scarlott's claim for breach of express warranty is based upon NNA's Limited Warranty.  ROA.1546-1547.  ROA.1557-1559.  As explained above, the express, limited warranty covers "any repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied

by Nissan." ROA.1546-1547. ROA.1557. ROA.1559. This Limited Warranty excludes coverage for components outside of NNA's distribution, the installation of aftermarket, non-Nissan accessories, and the improper installation of Nissan-approved accessories or components. *Id.*

NNA fully complied with any and all representations made in the warranty. At no cost to Scarlott, NNA covered warranty repairs to Scarlott's singular complaints regarding the engine control system, front suspension, supplemental restraint system, and interior finish. ROA.1458;16-1459;21. ROA.1460;9-20. ROA.1461;12-1462;10. ROA.1501;2-12. Scarlott's only persistent complaint related to electrical problems caused by the improper installation of a non-Nissan accessory, an item explicitly excluded under the warranty. ROA.1450;11-1451.8. ROA.1546-1547. ROA.1557. ROA.1559.

Furthermore, Scarlott has no evidence of a breach committed by NNA. The trial court did not err in granting NNA judgment on Scarlott's claims.

## I.     *Scarlott's Magnuson-Moss Claim is Barred Because she Did Not Participate in Informal Dispute Resolution.*

Under the MMWA, a consumer must first participate in informal dispute resolution before filing a claim under the Act. 15 U.S.C. § 2310(a)(3). *See also* ROA.1546-1547. ROA.1555. It is undisputed Scarlott did not complete NNA's informal dispute resolution program set up through the Better Business Bureau's BBB Auto Line before filing the present action. ROA.1505;16-1506;3.

ROA.1507;8-14.  Further, her Second Amended Complaint does not state whether she has used the program or why she has not done so.  *See generally*, ROA.239-65.

Because Scarlott failed to comply with the prerequisite of the MMWA, her claims brought under the Act against NNA fail as a matter of law.  *Sheris v. Nissan North America, Inc.*, No. 07-2516, 2008 U.S. Dist. LEXIS 43664, *22-23 (D.N.J. June 2, 2008) (finding "that [p]laintiff has not exhausted the dispute settlement procedures set forth in the Warranty and thus cannot assert his Magnuson-Moss claims"); *Pizzi v. Nissan Motors Corp.*, 38 Pa. D. & C.3d 435, 437-38 (1985) (ordering the plaintiff to amend his pleading to include whether he has conducted the informal dispute resolution program because "[p]laintiff's complaint does not aver that the Autoline complaint-resolution system provided for in the written warranty has been utilized.  Nor does the complaint aver any defense to the nonutilization of the system.").

## J.      *Scarlott's Expert Witness is No Evidence of Defect.*

As discussed above, to prevail against NNA, Scarlott must prove, through competent evidence, the Murano was defective when it left NNA's custody and control.  As a matter of law, Scarlott cannot make this showing.  The unequivocal evidence shows that due to Hurricane's improper installation, the mirror remained on at all times.  The mirror's installation instructions explicitly warned against this condition, noting such would drain a car's battery.  ROA.1540.

Scarlott designated Stephen Weaver as her retained liability and damage expert, who issued a report and gave deposition testimony. Weaver opined that an improper repair/replacement of the Murano's battery caused an internal component in the HomeLink mirror to fail, thus resulting in an intermittent drain of the battery. He believes when the Murano's battery was first replaced in September 2007, Clear Lake technicians created a "voltage spike or reverse polarity" situation. ROA.1643;9-1644;2. According to Weaver, this alleged voltage spike or reverse polarity overloaded other electronic equipment installed in the vehicle, including the aftermarket rearview mirror and its diode, causing the subsequent intermittent drain of the battery. ROA.1646;24-1647;9.

### 1.   Weaver Does Not Opine as to Vehicle Defect.

The District Court inquired as to what defect Scarlott alleged existed at the time the Murano left NNA's possession. Scarlott's counsel confirmed her expert has not issued any opinion concerning defect to a reasonable degree of certainty. ROA.5085;11-22. Weaver could not "pinpoint a specific cause" of the electrical problems with any degree of certainty. *Id*. For this independent reason, Weaver's opinions are no evidence of defect.

### 2.   Weaver's "Theory" is Merely a Hypothesis of Improper Repair by the Dealer.

Weaver does not opine there was a defect in the Murano's materials or workmanship. ROA.1643;9-1644;2. Instead, his "theory" is merely an allegation

of improper repair on the part of the dealership, Clear Lake, which is not an issue in this appeal.  He offered no evidence that this voltage spike ever happened.

### 3. Weaver Did Not Consider the Host of Evidence Related to the Improper Installation of the Aftermarket Homelink Mirror.

Weaver did not conduct any investigation into the cause of the Murano's electrical problems.  In particular, Weaver did not review the actual repair orders, but instead, glanced at the repair history that summarized the orders.

Q:  Is it your understanding that Clear Lake -- well, you've reviewed the repair orders, right?

A:  Yes.  Well, **the repair history, it's not the order**. I really refer [sic] to repair orders because sometimes it gives a clear view.  But I have the repair history and that's what I was provided.

Q:  You don't have the repair orders?

A:  Not the orders themselves, no.

ROA.1650;19-1651;1 (emphasis added).

Weaver has not made any inquiry into the repairs performed or the reasoning behind those repairs.  He has not spoken to anyone at Clear Lake who made the vehicle repairs, nor has he reviewed any deposition testimony in this case, including that of Clear Lake's service manager, Bob Gore, who has intimate familiarity with the electrical problems the Murano experienced.  ROA.1649;22-

1650;18.  Weaver made no inquiry as to how Clear Lake identified the cause of the

Murano's electrical problems.

> Q:     And do you know how Clear Lake determined the cause of the electrical problems in Miss Scarlott's vehicle was the Hurricane installation of the home link system?
>
> ***
>
> A:     I'm not sure.
>
> Q:     So the answer is:  You don't know, right?
>
> A:     I don't know.

ROA.1649;22-1650;18.

In other words, Mr. Weaver failed to conduct his due diligence in arriving at

his "expert" opinions in this case.  Weaver's "expert opinions" are nothing more

than subjective, unsubstantiated allegations.  By definition under the Federal Rules

of Evidence, such cannot and is not proper evidence.  An expert's report and his

bald opinions cannot be considered sufficient evidence.  *Viterbo v. Dow Chemical*

*Co.,* 825 F.2d 420, 421-22 (5th Cir. 1987) (affirming trial court's granting of

summary judgment and exclusion of expert testimony as unreliable, holding that

"[i]f an opinion is fundamentally unsupported, it provides no expert assistance to

the jury.").  *See also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 519

(1997) (holding a court may properly exclude opinion when it concludes there is

simply too great an analytical gap between the data and the opinion proffered);

*Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)  ("[A]n expert who

supplies nothing but a bottom line supplies nothing of value to the judicial process."), *cert. denied*, 117 S. Ct. 73 (1996); *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992) (holding evidence legally insufficient in *Bendectin* case when no understandable scientific basis was stated).

### 4.     Weaver Has Not Eliminated Other Causes for the Electrical Issues.

Weaver readily admits he is not familiar with the Homelink mirror's design. ROA.1652;12-20.  Instead and as he must, he assumes a voltage spike or reverse polarity during the first repair of the Murano caused the subsequent intermittent drain of the battery.  Yet he conducted no testing to verify this theory. ROA.1645;19-22.  1655;15-21.

Importantly, Weaver's defect opinion is based entirely upon a *possibility*. He believes his theory is *consistent* with the facts, even though he has not eliminated any other possible causes for the Murano's electrical problems.

> Q:     And what evidence do you have that someone at Clear Lake actually created this voltage spike?
>
> A:     Well, I'm looking at *probability factor* and electronic factor, and usually electronics today don't fail unless they're abused.

ROA.1644;9-13 (emphasis added).  Weaver further testifies he failed to consider any other causes of the electrical issue:

> Q:     When we were talking about your theory as to what caused these electrical problems, that is the

> voltage spike, did you consider any other alternative causes for these electrical problems?
>
> A:   No.
>
> Q:   Did you eliminate any other causes?
>
> A:   I had no other suspects.
>
> Q:   So the answer is you did not eliminate any other potential causes?
>
> A:   I didn't even consider any other causes.

ROA.1653;5-14.

An expert who merely testifies that facts are *consistent* with a desired theory of liability and does not rule out alternative theories does not present competent expert testimony. *See Shafer v. LG Elecs. U.S.A., Inc.*, No. 4:09-CV-105-Y, 2010 U.S. Dist. LEXIS 144737, *16 (N.D. Tex. Sept. 30, 2010) (excluding an expert's opinion as unreliable because he failed to consider and eliminate other causes); *Easter v. Aventis Pasteur, Inc.*, 358 F. Supp. 2d 574, 567-77 (E.D. Tex. 2005) (expert's inability to exclude other causes rendered his opinion inadmissible); *Wal-Mart Stores, Inc. v. Merrell,* 313 S.W.3d 837, 839-40 (Tex. 2010) (evidence of "general causation" was insufficient where evidence of "specific causation" was lacking, stating that "[e]vidence that halogen lamps can cause fires generally . . . does not establish that the lamp in question caused *this* fire"); *Volkswagen v. Ramirez*, 159 S.W.3d 897, 911-12 (Tex. 2004) (holding expert's causation opinion

is no evidence because he failed to rule out alternative explanations for the subject incident).

Weaver did not eliminate other potential causes of the electrical issues, *i.e.* improper installation of the aftermarket mirror, and has no evidence as to the specific cause of the Murano's battery failure. Such testimony, as a matter of law, does not constitute competent evidence on defect or causation.

In sum, Weaver has no testing, data, or authoritative literature supporting his hypothesis. Weaver himself has no confidence in the reliability of his opinions, and therefore, such opinions cannot be considered evidence in support of Scarlott's claims.

### 5. Weaver's Opinion that All Replaced Parts are Per Se Defective is Inadmissible.

Weaver additionally opines that merely because various component parts of the Murano were repaired after the sale, the Murano was defective. ROA.1649;10-21. Weaver's opinions regarding these "defects" are based on his own definition of "defect." Weaver states any need to correct or repair a part renders that component or system defective. *Id*. Weaver operates under this understanding even if the component part is repaired on the first attempt:

> Q:   When you say that a system is defective, what is
>      your definition of defective?
>
> A:   It's not operating as it was designed.

**Q:    So if anything goes wrong with the vehicle, then that's a defect?**

**A:    Yes**.

***

**Q:    And the fact that it had to be replaced once means that it was defective, right?**

**A:    Yes, sir, or it was cause to fail.**

Q:    So if any part fails and has to be replaced, even if it's corrected the first time, then you would list that as a defective component or system, right?

A:    At time of sale, yes.

ROA.652;13-18.  654;10-16 (emphasis added).

The undisputed evidence in this case indicates the Murano's engine control system was repaired once successfully, never requiring any other repair. ROA.1458;16-1459;7.  Weaver opines the engine control system was therefore defective at the time of sale.  ROA.666;9-11.  Similarly, Weaver opines the front suspension system was defective, yet he cannot identify the specifics of the repair, the need for the repair, or how many times the suspension was taken to a dealer for repair.  ROA.652;19-653;15.  Again, the undisputed evidence is the Murano was taken for repairs only once related to the front suspension, and no repairs were necessary because the dealership could not duplicate the complaint.  ROA.1469-1470.  ROA.1479-1480.  ROA.1459;8-21.

Q:    But your expert opinion is that that front suspension was still defective, right?

46

> A:     Well, it was not operating as it was designed for a
> vehicle that's new or very low mileage.  *I would
> think if you have to bring it back to the dealer for
> any repair, then it's defective.*

ROA.653;10-15 (emphasis added).

As a basis for his front suspension defect opinion, Weaver erroneously recalled the front suspension had been repaired twice—contrary to the undisputed evidence of the vehicle's repair history.  ROA.652;19-653;15.  ROA.1469-1470.  ROA.1479-1480.  ROA.1459;8-21.  The erroneous data upon which he relies is fatal to the reliability of Weaver's opinions.

Moreover, Weaver's opinion that the Murano was defective at the time of sale is also wholly without a reliable basis or methodology:

> Q:     Why do you say that all of these defects existed at
> the time of sale?
>
> A:     Yes.
>
> Q:     Why do you say that?
>
> A:     Well, they're there.    I mean, when things
> malfunction within a short period of time, and I'd
> say short period is anything under 12 to 15,000
> miles, then it has to be a component that was
> defective at the time of sale.

ROA.668;7-15.

Weaver's "defect" opinion is contrary to well-established Texas law that mere repair does not constitute defect.

### K.     Scarlott's Counsel Misrepresents the District Court's Statement.

Scarlott's counsel repeatedly cites to the District Court's statement that "I don't know what's wrong with the car. I've never known what's wrong with the car," claiming this statement precludes summary judgment. *See* Appellants' Brief, at p. 18. In fact, the District Court made this statement on October 10, 2013, at the hearing on NNA's Motion for Sanctions. ROA.5169-5170. ROA.5200. The Opinion on Summary Judgment was signed on August 28, 2013. ROA.2960-2965. There was no discussion at the October 10th hearing regarding whether summary judgment was or was not appropriate. Further, taken in context this quote reads quite differently:

> THE COURT: . . . **[Y]ou just misstated earlier about the facts of her car**. I don't know what's wrong with the car. I've never known what's wrong with the car. The problem is –
>
> MR. NOAH RADBIL: That's precisely our point, your Honor.
>
> THE COURT: No. **Your point is that you've taken four years and you still don't know enough**.

ROA.5200 (emphasis added). In fact, Scarlott's counsel made misrepresentations to the District Court regarding the subject vehicle and the District Court emphasized Scarlott did not have sufficient evidence to support her causes of action. Summary judgment was appropriately granted.

**Issue 3:**     **Application of the Discovery Rule to Scarlott's Claims against Hurricane.**

As Issue 3 does not pertain to NNA, NNA offers no response.

**Issue 4:**     **The District Court did not Err in Awarding NNA Costs and Fees.**

    *A.*     ***Scarlott Refused to Dismiss Suit Despite Overwhelming Evidence the Aftermarket Mirror Caused the Murano's Electrical Problems.***

As set forth in detail above, Scarlott's counsel needlessly and vexatiously dragged out this litigation after obtaining overwhelming evidence the aftermarket mirror caused the Murano's electrical problems.

Since the inception of suit when NNA made a single call to Clear Lake, it has been clear the aftermarket Homelink mirror caused the Murano's electrical issues.  ROA.3168-3170.  NNA explained to Scarlott the aftermarket mirror caused the Murano's battery to drain, even though Clear Lake told her that at the time of the repair.  *Id.*  Instead of dismissing NNA and joining Hurricane, Scarlott maintained suit, harassing NNA, driving up its defense costs, fabricating defect theories and repeatedly misrepresenting the facts in an attempt to avoid summary judgment and extort settlement from NNA.  ROA.3185.  Indeed, this is the Weisberg and Meyers business model.

In May 2010, NNA provided Scarlott with *sworn testimony* substantiating the aftermarket mirror caused the Murano's electrical problems and NNA had no involvement in design, manufacture, or installation of the aftermarket accessory.

ROA.1446-1457. NNA did not warrant the part or the installation. ROA.1447-1448. ROA.1456. Charged with this evidence, NNA sent Scarlott a letter, requesting Scarlott dismiss her suit and pay NNA reasonable attorneys' fees. ROA.3334. Scarlott declined.

A year later Scarlott joined Hurricane as a party to the litigation, alleging Hurricane negligently installed the aftermarket mirror. ROA.261-262. The day before the deposition of Hurricane's owner and corporate representative, Scarlott sent NNA an offer of settlement, demanding $40,000.00 from it. ROA.3335-3336. NNA declined.

The next day, Hurricane's representative was deposed. This deposition confirmed the aftermarket mirror caused the Murano's electrical problems. Hurricane admitted it originally installed the aftermarket mirror. Hurricane admitted it found the mirror remained on and was draining the battery. ROA.1528;3-1533;14. Hurricane acknowledged the problem and re-wired the mirror to comply with the manufacturer's instructions. ROA.1532;10-1533;6. ROA.1536-1544. Hurricane made this repair under Hurricane's warranty. ROA.1533;15-1534;3. At the time the repair was made, Scarlott was told the mirror caused the electrical drain. ROA.1458;6-8. ROA.1469-1470. ROA.1494-1495. ROA.1514;1-19. Even after Hurricane's deposition, Scarlott continued

prosecuting her claims against NNA.  NNA was properly awarded costs and attorney's fees for this conduct.

### B.  The District Court did Not Abuse its Discretion in Awarding Fees Pursuant to 28 U.S.C. § 1927.

Pursuant to 28 U.S.C. § 1927, a court may require an attorney who multiplies the proceedings unreasonably and vexatiously to pay the excess costs, expenses, and attorney fees incurred because of the conduct.  *FDIC v. Conner*, 20 F.3d 1376, 1384 (5th Cir. 1994). A determination of bad faith, satisfying the "unreasonable" prong, is proper where an attorney knowingly or recklessly pursues a frivolous claim.  *Malautea v. Suzuki Motor Co., Ltd.,* 987 F.2d 1536, 1544 (11th Cir. 1993); *Manax v. McNamara*, 842 F.2d 808, 814 (5th Cir. 1988).

To "vex" is defined, among others things, as "to bring trouble or distress to," "to subject to mental suffering," or "to irritate or annoy," as well as "to tease or torment."  *Ratliff v. Stewart*, 508 F. 3d 225, 235 n. 13 (5th Cir. 2007).  The Fifth Circuit has held "any 'reckless disregard of the duty owed to the court' can suffice."  *Id.* (citing *Edwards v. Gen. Motors Corp.,* 153 F.3d 242, 246 (5th Cir. 1998)).

When an attorney's conduct is so obviously unreasonable that a court can infer an "improper purpose" from the fact the attorney persisted in it, it is unnecessary for the court to explain at length why the vexatiousness prong has been met.  *Ratliff*, 508 F. 3d at 234.  Fees and costs associated with "the persistent

prosecution of a meritless claim" may be awarded. *Browning v. Kramer*, 931 F.2d 340, 345 (5th Cir. 1991). When the entire course of proceedings were unwarranted and should neither have commenced nor persisted, an award under § 1927 may shift the entire financial burden of an action's defense. *Id*;

After filing suit but before NNA filed an Answer, Scarlott was given the repair order that indicated the aftermarket mirror caused the electrical drain. ROA.1469-1470. ROA.1494. Scarlott personally spoke to Clear Lake's service manager, Bob Gore, who again confirmed they isolated the electrical drain to the aftermarket mirror Hurricane installed. ROA.804;19-805;6. ROA.1514;13-19. Scarlott knew the mirror was an aftermarket part, as she herself picked it out and took the vehicle to Hurricane for its installation. ROA.1499;22-24. ROA.1500;11-19. Further, Scarlott had NNA's New Vehicle Limited Warranty, which explicitly states non-Nissan accessories are not warranted. ROA.1546-1548. ROA.1557-1561. Despite the overwhelming evidence proving there was no defect in materials or workmanship, Scarlott and her counsel continued to prosecute the claims against NNA for **four years**.

NNA has detailed at length the procedural history of this case, including the evidence proving NNA is not liable. Since the inception of suit, it was clear NNA was not liable. Any cause of action Scarlott had was against Hurricane, not NNA.

Scarlott's four year assault on NNA has been nothing more than an attempt to extort settlement to avoid the extraordinary cost of defense of this case.

### C.     The District Court did Not Abuse its Discretion in Awarding NNA's Fees Pursuant to its Inherent Power.

A court may impose sanctions under its inherent power on a person for conduct in bad faith, willful disobedience of a court order, or for fraud on the court. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991); *Sahyers v. Prugh, Holliday & Karatinos, P.L.*, 560 F.3d 1241, 1245-46 & n.9 (11th Cir. 2009). "When a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions." *Toon v. Wackenhut Corrections Corp.*, 250 F.3d 950, 952 (5th Cir. 2001), *quoting Carroll v. The Jacques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997). Additionally, a court may impose sanctions under its inherent power on a person when necessary for the court to regulate its docket, promote judicial efficiency, and deter frivolous filings. *Mann v. Boatright*, 477 F.3d 1140, 1150 (10th Cir. 2007).

Again, Scarlott and her attorneys were well aware NNA was not liable in this matter, yet needlessly pursued claims against NNA for four years. Sanctions under the District Court's inherent power were appropriately granted.

**D.      *Weisberg & Meyers has a Pattern of Improperly Prosecuting Groundless Claims.***

The conduct of Noah Radbil and Weisberg and Meyers, LLC is consistent with a pattern of conduct these lawyers display in cases around the country. Weisberg and Meyers, LLC inflate defendants' costs and fees by filing and prosecuting baseless lawsuits.  For example, in finding Weisberg and Meyers, LLC liable for a defendant's costs and fees in a case regarding debt collection practices, the United States District Court for the Middle District of Florida made the following observations:

> Here, **the Court finds that Plaintiff and *his attorney multiplied the proceedings in this case unreasonably and vexatiously* and exhibited a *deliberate indifference to obvious facts***.  Indeed, Plaintiff verified a claim with multiple allegations that contradicted his own deposition testimony.
>
> ***Further, when it became apparent that discoverable evidence would not bear out the majority of the Complaint's claims, Plaintiff and his attorney failed in their duty to discontinue their quest*** . . .
>
> Even more troubling, ***Plaintiff's counsel [Aaron Radbil], an officer of the Court, filed a complaint wherein a majority of the allegations had no basis in fact and then failed to dismiss any of these allegations***, or requests for relief, until a summary judgment motion was filed.

*Tucker v. CBE Group, Inc.*, 710 F. Supp. 2d 1301, 1307 (M.D. Fla. 2010) (emphasis added).

The United States Court of Appeals for the Tenth Circuit recently affirmed a district court's finding that Weisberg and Meyers, LLC proceeded to trial on another groundless case alleging unfair debt collection practices:

> Mr. Ehrlich [of Weisberg & Meyers] should have realized upon careful continual re-evaluation of the claim as he prepared for trial that he lacked evidence . . . supporting [plaintiff's] assertion and testimony . . . Mr. Ehrlich therefore either failed to properly prepare for trial or the evidence did not exist . . . **In either case, he proceeded to trial when he should have known there was no basis to proceed.** In addition, during trial, the district court noted that Mr. Ehrlich was pursuing the smallest claim after all other claims had been dismissed and that the court did not know why he was pursuing it. **Based on these facts, Mr. Ehrlich objectively vexatiously and unreasonably multiplied the proceedings at [defendant's] expense.**

*Danielson-Holland v. Standley & Assocs.*, 512 Fed. Appx., 850, 853-54 (10th Cir. 2013).

Noah Radbil and the attorneys at Weisberg and Meyers, LLC have been admonished by federal courts for their "gamesmanship" and baseless continued pursuit of cases. *See, e.g.*, *Brookter v. GC Servs. Ltd. P'ship*, No. H-10-3149, 2011 U.S. Dist. LEXIS 44909, *9 (S.D. Tex. April 26, 2011) ("Moreover, the Court admonishes the plaintiff's attorney[s] [Noah Radbil and Aaron Radbil] that it will not permit such petty gamesmanship in the future. Once the defendants offered the plaintiff a full and complete recovery, she had nothing further to gain from continued litigation.").

Given the history of the present litigation and the repeated conduct of Weisberg and Meyers, LLC, the District Court did not abuse its discretion in awarding NNA costs and fees.

**Issue 5:** **<u>Award of Sanctions to Hurricane.</u>**

As this issue does not pertain to NNA, NNA will not respond.

**Issue 6:** **<u>NNA Submitted Thorough Records of Fees and Costs.</u>**

Scarlott's counsel claims NNA did not produce contemporaneous billing statements and did not submit "other evidence" to support its request for attorneys' fees. *See* Appellants' Brief, at p. 57. NNA's counsel did in fact bring billing records to the hearing on NNA's fees and costs, which records included a description of the work performed during each increment of time, as well as the total hours billed. ROA.5250;15-19. NNA's counsel further brought costs invoices. ROA.5252;10-11. The billing records were *unredacted*, and given they included a description of work performed during each relevant time increment, the records clearly contained privileged information protected by the attorney work-product privilege. ROA.5250;16-23. NNA's counsel tendered all records to the District Court for an *in-camera* inspection. ROA.5250;17-18. Tendering the records to opposing counsel would have constituted a waiver of the attorney work-product privilege. ROA.5250;22-23.

Scarlott's counsel further implies the District Court did not review any information NNA's counsel submitted because it did not want to audit NNA's billing records.  *See* Appellants' Brief, at p. 58.  In fact, NNA submitted evidence that its counsel billed 1,065 hours over the relevant four years, which fees totaled $194,918.00.  ROA.3187-3192.  ROA.5252.  NNA also submitted evidence of its costs, which were approximately an **additional** $20,000.00.  ROA.3187-3332.  The District Court then ordered, "Nissan North America will recover $180,000 in attorney's fees and costs because I don't want to audit **the costs**."  ROA.5256.  The District Court did not say it would not audit the attorneys' fees.  Rather, it held, "The description of the work and people and the rates by Nissan's counsel is perfectly reasonable."  ROA.5254.  The District Court ultimately awarded nearly **$35,000 less** than the total fees and costs of which NNA actually incurred.

Moreover, Scarlott's counsel agreed the fees were reasonable.  Scarlott's counsel told the District Court he has probably spent more hours on this case than NNA's attorneys have, commenting NNA's fees are not unusual:  "I think those fees, your Honor, would probably be what Mr. Patterson is used to dealing with in a warranty case that was handled for his client, Nissan."  ROA.5251.  Where the party seeking attorney's fees offers reasonable and credible testimony concerning the fees, and the party opposing the attorney's fees has the opportunity to contradict or disprove the testimony and fails to do so, the testimony of the witness

may be taken as true as a matter of law. *Northwinds Abatement, Inc. v. Employers Ins. Of Wausau*, 258 F.3d 345, 353 (5th Cir. 2001), citing *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990).

NNA has clearly submitted evidence adequate to determine reasonable hours and Scarlott's counsel did not dispute those hours were reasonable. *Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1044 (5th Cir. 2010); *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 325 (5th Cir. 1995). Attorneys' fees and costs were properly awarded.

**Issue 7:** **The District Court Properly Excluded Scarlott's Expert, Stephen Weaver.**

### A. *Weaver's Opinions Concerning Alleged Defect are Unreliable and thus Inadmissible.*

Contrary to Scarlott's assertions, NNA did not argue Weaver is unqualified to render defect opinions. Instead, NNA contends his opinions related to alleged defects are unreliable, untested, and unsupported by objective data.

As set forth above in Section J of Issue No. 4 of NNA's Argument, Weaver's testimony and opinions in this case are untested, unreliable, unsupported by objective facts or data, and contrary to Texas legal authority on defect. Weaver's opinions do not meet the reliability standard in Federal Rule of Evidence 702, and therefore should be excluded. NNA incorporates the argument and authorities made in Issue 4, Section J, above.

**B.    *Weaver's Opinions Concerning Damages are Likewise Unreliable.***

Weaver is not a damage expert and his damage opinions are unreliable. Scarlott fails to offer evidence of how a mechanic is qualified to render opinions concerning damages.  In fact, his only alleged qualification is that he has written over 300 reports for Weisberg & Meyers law firm each year.  ROA.644;3-15.

He opines if the alleged defects "had been factored in to the sale at the time of purchase, the vehicle would have been $7,970.25 less than the purchase price of $31,881."  ROA.639-640.  "Unreliable" is not a strong enough word to describe Weaver's method of arriving at this figure, which is undoubtedly not grounded "in the methods and procedures of science" and is no more than "subjective belief or unsupported speculation."  *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590 (1993).

Weaver's damage assessment is based upon his self-developed "formula" of assigning to each defective component a percentage value of the vehicle's purchase price.  ROA.664;1-18.  ROA.669-670.  The percentage value assigned to a component is based solely on Weaver's subjective declaration in any given case.  ROA.662-663.  ROA.664;1-18.  It is not based upon any data, any peer-reviewed or published work, or even any written document in Weaver's possession.  ROA.662-663.  ROA.669-670.  The assigned values are not even consistent from case to case.  ROA.664;9-18.  Indeed, the percentage values have even fluctuated

from report to report in the instant case.  ROA.639-640.  ROA.667.  ROA.679.

Essentially, Weaver merely plucks a percentage value out of the air and proclaims

that a vehicle's allegedly defective component has diminished the vehicle's total

value at the time of sale by that percentage.

The wholly subjective, conclusory, and baseless nature of Weaver's

"formula" is further accentuated by his own description. One value was assigned

earlier in the case because "at the time I felt that's what it was."  ROA.662;9-14

(emphasis added).  Another assigned value was "based on approximate.  It's kind

of an average replacement and repair value for that system."  ROA.665;16-17

(emphasis added).  Prior to his re-assignment of percentage values in an amended

report, "I felt that I had not given that the proper consideration and so, therefore, I

rewrote it."  ROA.667;13-15.

Weaver's assessment of a hypothetical diminution in value at the time of

sale is concocted purely to serve Weisberg and Meyers, for whom he has written

hundreds of reports.  His so-called "formula" or method is not accepted by the

relevant scientific community, has not been published or subject to peer-review, is

wholly subjective, and is not based on any data.

Weaver's opinions in this case were properly excluded.

## CONCLUSION

For all the above reasons, Nissan North America, Inc. respectfully prays this Court deny Appellants' requested relief, affirm the decisions of the District Court granting NNA's Motion for Summary Judgment and awarding NNA $180,000 in fees and costs, and also prays for such other relief to which it is entitled.

Respectfully submitted:

*/s/ Jeffrey S. Patterson*
**JEFFREY S. PATTERSON**
State Bar No. 15596700
So. District Bar No. 12446
e-mail: jpatterson@hdbdlaw.com
**HARTLINE DACUS BARGER DREYER LLP**
6688 North Central Expressway, Suite 1000
Dallas, TX 75206
(214) 369-2100
(214) 369-2118
**ATTORNEY FOR APPELLEE**
**NISSAN NORTH AMERICA, INC.**

## CERTIFICATION

I certify that I have reviewed the brief and concluded that every factual statement in the brief is supported by competent evidence included in the record.

*/s/ Jeffrey S. Patterson*
**JEFFREY S. PATTERSON**

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 26th day of February, 2014, I caused this Appellee's Brief to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the registered CM/ECF users.

*/s/ Jeffrey S. Patterson*
**JEFFREY S. PATTERSON**

## **CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*13,003*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: February 26, 2014        */s/ Jeffrey S. Patterson*
                                *Counsel for Appellee*